**F.D.P. and J.A.P., Individually and on Behalf of Their Minor Daughter, S.M.P., Appellants**

v.

**Richard Albert FERRARA, Jr., Silvia Ferrara, Individually and as Guardian of Richard Albert Ferrara, Jr.; the Indiana Guidance Center Inc., and Indiana County Group Homes, Inc., Appellees.**

**F.D.P. and J.A.P., Individually and on Behalf of Their Minor Daughter, S.M.P., Appellees**

v.

**Richard Albert Ferrara, Jr., Silvia Ferrara, Individually and as Guardian of Richard Albert Ferrara, Jr., the Indiana Guidance Center, Inc., and Indiana County Group Homes, Inc., Appellees.**

**Appeal of Community Living and Learning, Inc., Formerly Known as Indiana County Group Homes, Inc., Appellant.**

Superior Court of Pennsylvania.

Argued Jan. 16, 2002.

Filed July 8, 2002.

Reargument Denied Sept. 12, 2002.

Rhonda J. Sudina, Pittsburgh, for Indiana County Group Homes. Inc.

Jeanette Ho, Pittsburgh, for Indiana Guidance Center. Inc.

Before: DEL SOLE, P.J., BOWES and KELLY, JJ.

BOWES, J.:

¶ 1 F.D.P. and J.A.P., individually and on behalf of their minor daughter, S.P. ("Appellants"), filed the appeal at no. 1195 WDA 2001 from the June 18, 2001 order granting the preliminary objections of the Indiana County Guidance Center ("Guidance Center"). Community Living and Learning, formerly known as Indiana County Group Homes, Inc. ("Group Home") filed the appeal at no. 1217 WDA 2001 from the portion of the same order that denied its preliminary objections. The trial court certified that order pursuant to Pa.R.A.P. 341(c). This action involves a tragic incident that occurred on June 14, 1996, when Richard Albert Ferrara, Jr. ("Ferrara") sexually molested S.P. We affirm the appeal at 1195 WDA 2001 and quash the appeal at 1217 WDA 2001.

¶ 2 On May 29, 1998, Appellants instituted this action by writ of summons against Ferrara, Sylvia [1] Ferrara, both individually and in her capacity as legal guardian of Ferrara, the Guidance Center, and Group Home. Appellants then unsuccessfully tried to obtain Ferrara's treatment records from the Guidance Center prior to filing their complaint. After being ruled to do so, Appellants filed a complaint that contained the following allegations.

Sandra Neuman, Pittsburgh, for F.D.P., J.A.P. and S.M.P.

1. In Appellant's complaint and the pleadings filed by the other defendants, Ms. Ferrara's first name is spelled, "Silvia" which was the spelling used in the notice of appeal; however, in her answer, Ms. Ferrara spelled her first name, "Sylvia." We will use the spelling utilized by Ms. Ferrara.

¶3 Guidance Center is a non-profit corporation that provides mental health and mental retardation services in Indiana County. Group Home is a non-profit corporation that operates a community residential group home for mental health and mental retardation patients in Indiana County. From 1984 and continuing until the June 14, 1996 incident, Ferrara was a resident of the group home operated by Group Home in Indiana, Pennsylvania, and was there pursuant to a voluntary placement agreement. Ferrara had been placed there by Guidance Center, which served as the base service unit for Ferrara pursuant to 55 Pa.Code § 4210. Under the Mental Health and Mental Retardation Act of 1966, 50 P.S. §§ 4101, *et seq.* (the "MHMR Act"), local authorities are required to create base service units such as Guidance Center. As a base service unit, Guidance Center was responsible for planning a comprehensive treatment program for Ferrara and making available the necessary services to him on a continuing basis under 55 Pa.Code § 4210.21.

¶4 Pursuant to 55 Pa.Code § 4210.21, Guidance Center, as Ferrara's base service unit, had the following responsibilities with respect to Ferrara: 1) facilitate and coordinate his movement from service to service; 2) insure continuity of care; 3) maintain a continuing relationship with him; 4) provide an intake study and make recommendations about Ferrara's care; and 5) develop a comprehensive treatment program for him.

¶5 Pursuant to the MHMR Act, local authorities also are empowered to contract with others for the provision of living arrangements for persons in need of care, and the Group Home provided for Ferrara's living arrangements under that agreement with the local authority. Un-der the Pennsylvania code of regulations promulgated pursuant to the MHMR Act, Group Home, as the provider of community living arrangements for Ferrara, had the responsibility to 1) perform an initial assessment of him to determine the necessary level of care; 2) develop an individual program plan for him; 3) review that program every three months; and 4) revise the program if Ferrara showed no progress toward a goal or if new goals were required.

¶6 As of the date of the incident in question, Guidance Center and Group Home knew that Ferrara had "a long-standing history of sexually deviant behavior including sexual assault of minor children, sexual aggressiveness towards others, sexual relations in public places; and inappropriate touching of staff and residents." Complaint, 11/16/00, at 12. On June 14, 1996, Appellants resided in Rossiter, Pennsylvania, and Ferrara's parents, Mary and Richard Ferrara, were neighbors of Appellants. Both Mary and Richard Ferrara were physically and mentally handicapped.

¶7 In the complaint, Appellants alleged, "On June 14, 1996, Richard A. Ferrara, Jr., was released by the Group Home into the custody of his aunt, the defendant Sylvia Ferrara, who in turn permitted him to go to his parents' home on First Street, Rossiter, PA 15722, where he was unsupervised." *Id.* at ¶14. While at his parents' home, Ferrara lured then six-year-old S.P. into the basement where he sexually molested her. As a result, S.P. experienced severe mental, physical, and emotional trauma.

¶8 Appellants alleged in relevant part that Guidance Center breached its duty of care to Appellants by engaging in the following negligent acts: 1) failing to provide

and arrange for appropriate treatment of Ferrara's sexually deviant behavior; 2) failing to house him in a more restrictive environment than Group Home; 3) allowing him to be at his parents' home unsupervised when it knew or should have known that he would be in contact with young children; 4) failing to seek or pursue a civil commitment. *Id.* at ¶ 20.[2]

¶ 9 Appellants alleged that Group Home breached its duty of care to Appellants by engaging in the same negligent acts as well as the following additional negligent acts: releasing Ferrara into his aunt's custody when it knew or should have known that he would be in contact with young children and permitting Ferrara to leave its premises on June 14, 1996. *Id.* at ¶ 23.

¶ 10 Sylvia Ferrara filed an answer that contains the following relevant allegations. First, she asserted that Mary Ferrara was deceased in June 1996. Second, Sylvia denied that Ferrara was released into her custody on June 14, 1996. Specifically, she contended that she notified the parties with custody of Ferrara not to permit him to return to his parents' home or to Rossiter. Thus, Ferrara was present in Rossiter without her knowledge or consent, but rather had been taken by personnel of Group Home directly to his parents' home. She always demanded that those in charge of Ferrara's custody keep him under supervision and appropriate care at the Group Home and she told his mental health supervisors that Ferrara should not be allowed to stay in his father's custody.

¶ 11 Guidance Center and Group Home filed preliminary objections on the ground that Appellants had failed to state a cause of action. In its preliminary objections, Group Home alleged that it had an agreement with Sylvia Ferrara whereby it would release Ferrara into her custody for home visits. Further, Group Home asserted that on June 14, 1996, Ferrara was released into Sylvia's custody for the purpose of one of those home visits and that was during such a visit that the minor plaintiff was harmed.

¶ 12 In response, Appellants filed an amended complaint containing additional allegations. On June 14, 1996, Appellants were aware that Ferrara had engaged in the following conduct. In the early and mid–1970s, he was the subject of allegations that he had engaged in sexually inappropriate activity with young children in the community of Rossiter. In 1978, he was cited for sexual misconduct with a young child and in lieu of criminal prosecution, he was sent to a residential facility. In the mid–1980s, he was suspected of sexually assaulting an eight-year-old girl at a local church. In the mid–1990s, he was suspected of engaging in sexual relations with an underage girl on numerous occasions. In countless evaluations conducted by Guidance Center and Group Home between 1984 and 1996 while Ferrara was a resident at Group Home, he was described as lacking the ability to control his sexually deviant behavior. In the 1990s, he was cited for having sexual relations in open public while he was a resident of Group Home. He was constantly reprimanded for inappropriate sexual contact with staff members throughout his stay at the Group Home.

¶ 13 The preliminary objections were renewed, and on May 21, 2001, the trial court

2. The complaint also contained averments that Guidance Center should have warned Appellants of Ferrara's propensity for sexual misconduct. However, as discussed in the text *infra,* Appellants have abandoned their failure-to-warn cause of action.

entered an opinion and order granting Guidance Center's preliminary objections, but denying Group Home's preliminary objections. The trial court concluded that, based on Sylvia's responsive pleading, there was an issue as to whether Group Home had released Ferrara directly into the care of his incompetent father. In addition, the trial court noted that Appellants had abandoned their claim that Group Home and Guidance Center had a duty to warn them of Ferrara's propensity to commit sexual misconduct against minors.

¶ 14 Appellants and Group Home separately petitioned for an order of finality pursuant to Pa.R.A.P. 341(c). On June 18, 2001, the court entered an order determining that an immediate appeal would facilitate resolution of the entire case and designated the May 21, 2001 order as final under Pa.R.A.P. 341(c). Appellants and Group Home filed the present appeals from the order.

¶ 15 Initially, we must address our jurisdiction over these appeals. Under Pa. R.A.P. 341(b), a final order is defined in relevant part as one that disposes of all claims and all parties. Herein, as noted, the order dismisses one, but not all, of the parties. Pa.R.A.P. 341(c) provides that when more than one claim for relief is presented or when multiple parties are involved, the trial court "may enter a **final** order" as to one or more but fewer than "all of the claims and parties" upon "an express determination that an immediate appeal would facilitate resolution of the entire case." Pa.R.A.P. 341(c) (emphasis added). Such an order is appealable when entered. *Id.* Thus, Rule 341(c) certification, under the clear language of the rule, is available only to "final" orders disposing of one but fewer than all parties or causes of action.

¶ 16 An order **denying** a party's preliminary objections is and always has been defined as an interlocutory order. *Chase Manhattan Mortgage Corp. v. Hodes,* 784 A.2d 144 (Pa.Super.2001); *Grimme Combustion, Inc. v. Mergentime Corp.,* 385 Pa.Super. 260, 560 A.2d 793 (1989); *see also Shadduck v. Christopher J. Kaclik, Inc.,* 713 A.2d 635 (Pa.Super.1998). An interlocutory order does not place either a party or a claim out of court. Such interlocutory orders are appealable pursuant to 42 Pa.C.S. § 702(b)[3] and Pa. R.A.P. 312[4] and 1311,[5] which relate to appeals from interlocutory orders by permission. Rule 341(c) was not designed to abrogate this practice; otherwise, Rules 312 and 1311 would be superfluous. Rather, certification under Rule 341(c) was de-

3. That section provides, "When a court or other government unit, in making an interlocutory order in a matter in which its final order would be within the jurisdiction of an appellate court, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the matter, it shall so state in such order. The appellate court may thereupon, in its discretion, permit an appeal to be taken from such interlocutory order."

4. Rule 312 states that an appeal from an interlocutory order may be taken by permission under Chapter 13 of the Rules of Appellate Procedure.

5. Pa.R.A.P. 1311 provides that an appeal may be taken by permission under 42 Pa.C.S. § 702(b) from any interlocutory order of a lower court. That rule also sets forth the rules and procedures relating to petitions for permission to appeal from an interlocutory order.

signed to allow for an immediate appeal of a "final" order relating to less than all parties or less than all claims. In other words, it applies to orders dismissing parties and dismissing claims.

¶ 17 Our conclusion in this regard is reinforced by an examination of the history of Rule 341. Under the previous version of Pa.R.A.P. 341, an order dismissing one party was considered final as to that party and appealable at that time. *Keech v. Mead Johnson & Co.*, 398 Pa.Super. 329, 580 A.2d 1374 (1990). Similarly, an order dismissing one cause of action, as long as the cause of action was separate and distinct from any remaining causes of action, also was considered final as to that cause of action and appealable at that time. *Motheral v. Burkhart*, 400 Pa.Super. 408, 583 A.2d 1180 (1990). Those orders were considered final since they involved dismissal of the cause of action or of the party, and therefore, they placed the opposing party out of court as to that party or that cause of action. Rule 341 was amended so as not to allow piecemeal appeals from these types of "final" orders dismissing less than all of the parties or less than all of the claims unless the trial court made the requisite determination under Rule 341(c).

¶ 18 In the present case, the portion of the order from which Group Home appeals did not dismiss Group Home; instead, that portion of the order denied its preliminary objections. An order denying preliminary objections does not put a litigant out of court as to anything, is not "final," and cannot be certified under Pa. R.A.P. 341(c). Furthermore, it is not an interlocutory order appealable as of right under Pa. R.A.P. 311. Since Group Home did not follow the proper procedure under 42 Pa.C.S. § 702(b) and Pa.R.A.P. 1311 to appeal from that interlocutory order, the appeal at No. 1217 WDA 2001 must be quashed. *Commonwealth v. Fleming*, 2002 PA Super 56, 794 A.2d 385; *Hoover v. Welsh*, 419 Pa.Super. 102, 615 A.2d 45 (1992). We note that the propriety of that order, as with all interlocutory orders, can be determined after a final order has been entered in this action and the appropriate appeal taken.

¶ 19 The remaining appeal, by Appellants, is from an order dismissing a party and therefore appropriately was certified under Pa.R.A.P. 341(c).[6] We now examine whether Guidance Center properly was dismissed from this action based on Appellants' failure to state a claim against

---

**6.** Neither party has raised the propriety of the certification decision. *Compare Pullman Power Products of Canada, Ltd. v. Basic Engineers, Inc.*, 713 A.2d 1169, 1173 (Pa.Super.1998) (party raised propriety of certification decision; we reversed since trial court did not consider four factors, which are outlined in official note to Rule 341, in rendering its certification decision); *see* Official Note to Rule 341 (trial court should consider the following factors when determining whether an immediate appeal of a non-final order would facilitate resolution of the entire case: (1) whether there is a significant relationship between adjudicated and unadjudicated claims; (2) whether there is a possibility that an appeal would be mooted by further developments; (3) whether there is a possibility that the court or administrative agency will consider issues a second time; [and] (4) whether an immediate appeal will enhance the prospects of settlement).

In the present case, we conclude that an immediate appeal may enhance settlement prospects. We also conclude that if we delay determining whether Guidance Center properly was dismissed, there is a significant risk of the necessity for costly re-litigation, as the case involves complex issues of liability based on the actions of third parties. Therefore, we will consider the propriety of Guidance Center's dismissal. *Gustine Uniontown Associates, Ltd. v. Anthony Crane Rental, Inc.*, 786 A.2d 246 (Pa.Super.2001).

it. When reviewing a trial court's order granting preliminary objections in the nature of a demurrer,

> We must accept as true all the well-pleaded material facts set forth in the complaint and all reasonable inferences deducible from those facts. Accepting these facts and inferences, we then determine whether the pleader has failed to state a claim on which relief may be granted, and we will affirm the grant of a demurrer only if there is certainty that no recovery is possible.

*Solomon v. United States Healthcare Systems of Pennsylvania,* 797 A.2d 346, 2002 PA Super 110, ¶ 6, 797 A.2d 346 (quoting *Atkinson v. Evans,* 787 A.2d 1033, 1034 (Pa.Super.2001)).

¶ 20 Appellants premise liability against Guidance Center upon Restatement (Second) of Torts § 319, which they ask us to consider in connection with the duties imposed upon Guidance Center under the MHMR Act. Section 319 states, "One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm."

¶ 21 At the onset, we note that as a general rule, there is no duty to control the conduct of a third party to protect another from harm unless there is a special relationship between the actor, in this case Guidance Center, and the third person, in this case Ferrara, that imposes a duty upon the actor to control the third person's conduct or unless there is a special relation between the actor and the other, which in this case is S.P., which gives the other a right to protection. Restatement (Second) of Torts § 315.

¶ 22 In the present case, there is no special relation between S.P. and Guidance Center; rather, Appellants assert that there was a special relationship between Guidance Center and Ferrara that imposed a duty upon Guidance Center to control Ferrara's conduct pursuant to section 319.

¶ 23 Appellants contend in this case that the duty to control Ferrara's conduct is imposed under the MHMR Act and regulations promulgated thereunder inasmuch as they require Guidance Center, as Ferrara's base unit, to perform certain responsibilities regarding his treatment. They also observe that Illustration 2 under Restatement (Second) of Torts § 319 is similar to the situation at issue herein. That illustration states that if the actor operates a private sanitarium for the insane and through the negligence of one of the actor's employees, the third party, who is a homicidal maniac, escapes and attacks the plaintiff, the actor is subject to liability to the plaintiff.

¶ 24 Appellants urge us to impose such a duty herein under Restatement (Second) of Torts § 319. They refer to numerous cases where the Pennsylvania courts have held that a defendant is subject to liability for the actions of third parties. We first examine the cases that discuss liability of doctors and other health care providers for harm caused to third parties by the actions of their patients.

¶ 25 We begin our analysis with *Emerich v. Philadelphia Center for Human Development,* 554 Pa. 209, 720 A.2d 1032 (1998), where a majority of our Supreme Court held that a mental health provider was subject to liability for harm caused to a third party by a patient. In that case, the patient conveyed a specific threat to harm the third party. *Emerich* created a

carefully designed and limited cause of action based upon a failure to warn. Under the majority decision, a failure-to-warn cause of action will exist only when the mental health patient has conveyed a specific threat to harm the actual victim. In such a case, the duty of the mental health care provider is limited to warning the third party of the threat conveyed by the patient. As noted, Appellants have abandoned this cause of action because Ferrara did not convey a specific threat to harm S.P.

¶ 26 Appellants invite us to apply the rationale in a line of cases imposing liability on a physician for failing to properly advise a patient who has a communicable disease when the patient relied upon the improper advice and spread the disease to a third party. *DiMarco v. Lynch Homes–Chester County, Inc.*, 525 Pa. 558, 583 A.2d 422 (1990); *Troxel v. A.I. Dupont Institute*, 450 Pa.Super. 71, 675 A.2d 314 (1996).

¶ 27 Those cases again are specifically limited to their circumstances and impose liability due to the peculiar nature of communicable diseases, which involve a direct threat to public health. Under the reasoning employed in those cases, liability is premised upon the physician's awareness that his advice concerning the communicable disease is directly relevant to its spread to third parties. Thus, the duty is imposed because "it is imperative that the physician give his or her patient the proper advice about preventing the spread of the disease." *DiMarco*, 583 A.2d at 424. Moreover, those cases impose the duty pursuant to Restatement (Second) of Torts, § 324A, which relates to an actor who renders services under conditions where the actor should recognize that the services are necessary for the protection of a third person. Mental health services are

provided for the protection of the patient. Furthermore, mental health patients do not have a disease that is communicable to the public nor do they present a peculiar threat to the public. The reasoning of those cases is not applicable herein.

¶ 28 We also disagree with Appellants' final contention, which is that a duty should be imposed under *Hutchison v. Luddy*, 560 Pa. 51, 742 A.2d 1052 (1999). In that case, our Supreme Court imposed liability on the church superiors of a priest who engaged in sexual molestation of a parishioner in circumstances where those superiors had knowledge of the priest's conduct. In *Hutchison*, liability clearly was premised upon the master-servant relationship between the priest and his superiors as well as the special relationship between the parishioner, on the one hand, and the superiors in the church, on the other hand.

¶ 29 Our Supreme Court imposed a duty by applying: 1) the principles outlined in Restatement (Second) of Torts § 317, which provides that a master has a duty to control the conduct of his servant under certain circumstances; and 2) other cases where an employer-employee relationship existed between the defendant and the third party who caused the plaintiff's harm and where the plaintiff was in a special relationship with the employer of the third party, such as where a boy scout master abuses a boy scout or where a school employee abuses a student.

¶ 30 In the present case, Ferrara and Guidance Center did not have an employer-employee relationship, and there was no special relationship between Guidance Center and S.P. S.P. was not a member of a group over which Guidance Center had control and for which Guidance Center hired Ferrara. Those two conditions

clearly were critical to the imposition of liability in *Hutchison.* *Also compare Reider v. Martin,* 359 Pa.Super. 586, 519 A.2d 507 (1987) (where landlord undertook contractual obligation to provide lock to tenants, landlord was subject to liability for harm caused by third party who entered through unlocked door and attacked tenant).

¶ 31 Thus, while we agree with Appellants' observation that a variety of duties have been imposed for the acts of third parties under the case law, nonetheless, none of those duties is directly applicable in this case. Furthermore, we note that Pennsylvania courts are reluctant to subject a person to liability for the acts of a third party in the absence of compelling circumstances. Indeed, there are a number of cases significantly analogous to the present one where the courts have refused to impose such liability.

¶ 32 The case most factually similar to the instant case is *Heil v. Brown,* 443 Pa.Super. 502, 662 A.2d 669 (1995).[7] In *Heil,* the mental health patient, such as Ferrara herein, began treatment under the MHMR Act on a voluntary basis. Defendants in that case included the patient's mental health providers, such as Guidance Center in this case. In *Heil,* the patient's conditions worsened, but when his treating physician and psychiatrist were not available, the patient's social worker drafted a treatment plan and told the patient to return to see a psychiatrist. The patient was not committed even though he appeared very agitated. The following day, the patient experienced a psychotic episode while driving and drove his car into a police van. A police officer was injured

severely in the accident, and he and his wife instituted an action against the mental health care providers.

¶ 33 We affirmed the grant of summary judgment in favor of the defendants. We held "that mental health professionals do not owe a duty to protect third parties." *Id.* at 671 (footnote omitted). We concluded that liability was not present because there was no relationship between the mental health providers and the plaintiffs that created any legal obligation based upon the fact that the harm was not foreseeable. While the occurrence of a traffic accident due to a psychotic episode is considerably less foreseeable than the fact that a sexual molester will molest when he consistently has displayed such behavior, *Heil* nonetheless supports the position that a mental health provider owes no duty to protect against the actions of his patient in the absence of special circumstances such as those present in *Emerich.* See also *Brisbine v. Outside in School of Experiential Education, Inc.,* 2002 PA Super 138, 799 A.2d 89; *Crosby by Crosby v. Sultz,* 405 Pa.Super. 527, 592 A.2d 1337 (1991).

¶ 34 Indeed, in *Dunkle v. Food Service East, Inc.,* 400 Pa.Super. 58, 582 A.2d 1342 (1990), we held that mental health providers were not liable for harm caused by an admittedly dangerous patient since the patient had failed to convey a specific threat of harm against his eventual victim. We stated that a psychologist or psychiatrist owes no duty to warn "or otherwise protect" a non-patient where the patient has not threatened to inflict harm on a particular individual. *Id.* at 1342. We noted, "To hold otherwise would not only hinder the psychologist's relationship with the patient

7. *Allentown State Hospital v. Gill,* 88 Pa. Cmwlth. 331, 488 A.2d 1211 (1985), upon which Appellants rely, appears to be inconsistent with *Heil.* We, however, are bound by *Heil.* *Marks v. Nationwide Insurance Co.,* 762 A.2d 1098 (Pa.Super.2000).

and frustrate the psychologist's ability to properly treat the patient, but additionally, it would infringe upon the psychologist-patient privilege." *Id.*[8]

¶ 35 Our Supreme Court has delineated the considerations that must be weighed when we are deciding whether to create a duty. The primary consideration is simply social policy. In *Gardner v. Consolidated Rail Corp.*, 524 Pa. 445, 573 A.2d 1016 (1990), our Supreme Court explained:

> In determining the existence of a duty of care, it must be remembered that the concept of duty amounts to no more than "the sum total of those considerations of policy which led the law to say that the particular plaintiff is entitled to protection" from the harm suffered. *Leong v. Takasaki*, 55 Haw. 398, 520 P.2d 758, 764 (1974). To give it any greater mystique would unduly hamper our system of jurisprudence in adjusting to the changing times. The late Dean Prosser expressed this view as follows:
>
> These are shifting sands, and no fit foundation. There is a duty if the court says there is a duty; the law, like the Constitution, is what we make it. Duty is only a word with which we state our conclusion that there is or is not to be liability; it necessarily begs the essential question. When we find a duty, breach and damage, everything has been said. The word serves a useful purpose in directing attention to the obligation to

be imposed upon the defendant, rather than the causal sequence of events; beyond that it serves none. In the decision whether or not there is a duty, many factors interplay: The hand of history, our ideas of morals and justice, the convenience of administration of the rule, and our social ideas as to where the loss should fall. In the end the court will decide whether there is a duty on the basis of the mores of the community, "always keeping in mind the fact that we endeavor to make a rule in each case that will be practical and in keeping with the general understanding of mankind."

*Id.* at 454–55, 573 A.2d at 1020 (quoting *Sinn v. Burd*, 486 Pa. 146, 164, 404 A.2d 672, 681 (1979)); *accord Althaus, supra.*

■ ¶ 36 The following factors, which are derived from the above principles, are to be applied in determining the existence of a duty: "(1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; (5) the overall public interest in the proposed solution." *Brisbine, supra* at ¶ 17.

■ ¶ 37 In this case, the social utility of Guidance Center's work weighs heavily against the finding of a duty. Its statutory obligation is to Ferrara and also to provide service to Ferrara in the least restrictive environment possible. 50 P.S. § 7107.[9] The consequences of imposing a

8. We also note that there is a plurality decision of our Supreme Court discussing the liability of mental health providers to third parties who are harmed by the actions of their patients. *See Althaus v. Cohen*, 562 Pa. 547, 756 A.2d 1166 (2000). In that decision by three justices on a six-justice court with one justice not participating, our Supreme Court held that a treating psychiatrist or psychologist owes no duty of care to parents of a

child-abuse victim based on allegations that the defendant negligently treated the child patient. That case was limited in application to patients who are being treated based upon allegations of child abuse.

9. That section provides, "Individualized treatment plan means a plan of treatment formulated for a particular person in a program appropriate to his specific needs. To the ex-

duty in this case are grave. Treatment of the mentally ill is not an exact science. If we allow recovery against mental health and mental retardation providers for harm caused by their patients except in the clearest of circumstances, we would paralyze a sector of society that performs a valuable service to those in need of mental health care. Thus, we decline to impose a duty of ordinary care under Restatement (Second) of Torts § 319 on providers of mental health and mental retardation services.

¶ 38 We next consider Appellants' contention that a duty is created under the MHMR Act. We begin our analysis with an examination of *Goryeb v. Pennsylvania Department of Public Welfare*, 525 Pa. 70, 575 A.2d 545 (1990). *See also Sherk v. County of Dauphin*, 531 Pa. 515, 614 A.2d 226 (1992) (applying *Goryeb*). In *Goryeb*, a dangerous and suicidal psychiatric patient was released by a state mental institution even though he should have remained hospitalized under the relevant provisions of the Mental Health and Procedures Act ("MHPA"), 50 P.S. § 7101, *et seq*. He killed his former girlfriend, her current boyfriend, and another person who happened to be in the same home. He then committed suicide. An action was brought by or on behalf of the shooting victims against the Commonwealth, the Department of Public Welfare, and a hospital physician. Plaintiffs alleged in relevant part that the defendants had been grossly negligent in releasing the patient when they knew that he was a danger to himself and others. The patient allegedly had received no psychiatric treatment due to staffing shortages while he was hospitalized.

¶ 39 The defendants raised the defense of sovereign immunity, the trial court permitted invocation of that defense, and the Commonwealth Court reversed. The Supreme Court granted review, concluding first that sovereign immunity did not apply since an exception to sovereign immunity exists for medical-professional liability. It then stated specifically that when a Commonwealth party participates in a decision that a person be examined, treated, or discharged pursuant to the Mental Health and Procedures Act, such a party shall be civilly liable for such decision when the party engages in willful misconduct or gross negligence. In so doing, it relied specifically upon section 7114 of the Act, which provides:

### § 7114 Immunity from civil and criminal liability

In the absence of willful misconduct or gross negligence, a county administrator, a director of a facility, a physician, a peace officer or any other authorized person who participates in a decision that a person be examined or treated under this act, or that a person be discharged, or placed under partial hospitalization, outpatient care or leave of absence, or that the restraint upon such person be otherwise reduced, or a county administrator or other authorized person who denies an application for voluntary treatment or for involuntary emergency examination and treatment, shall not be civilly or criminally liable for such decision or for any of its consequences.

The *Goryeb* Court concluded that this language must be construed as creating liability to people harmed when a party com-

---

tent possible, the plan shall be made with the cooperation, understanding and consent of the person in treatment, and shall impose the

least restrictive alternative consistent with affording the person adequate treatment for his condition."

mits gross negligence or willful misconduct in treatment, discharge, or examination of a mentally ill patient within the purview of the MHPA. It further noted in passing that its determination that such a duty exists is consistent with Restatement (Second) of Torts § 319.

¶ 40 *Goryeb* is particularly instructive. Indeed, in *Emerich, supra,* our Supreme Court cemented the holding in that case, clearly recognizing the cause of action created in *Goryeb* as a separate and distinct cause of action against mental health providers operating pursuant to the provisions of the MHPA.

■ ¶ 41 The *Goryeb* Court grounded its holding that the MHPA creates a cause of action against mental health providers on the language in section 7114 of the MHPA, which provides for liability in the case of gross negligence. In the present case, Ferrara was treated pursuant to the provisions of the MHMR Act, which contains similar language:

No person and no governmental or recognized nonprofit health or welfare organization or agency shall be held civilly or criminally liable for any diagnosis, opinion, report or any thing done pursuant to the provisions of this act if he acted in good faith and not falsely, corruptly, maliciously or without reasonable cause; provided, however, that causes of action based upon gross negligence or incompetence shall not be affected by the immunities granted by this section.

50 P.S. § 4603.

¶ 42 Given our Supreme Court's treatment of identical language in the MHPA as creating liability for gross negligence, we believe that the Court would reach the same result under the MHMR Act. *See Rhines v. Herzel,* 481 Pa. 165, 392 A.2d 298 (1978) (MHMR Act providers were subject to liability based upon allegations of gross negligence for death of inpatient in mental health facility who was killed by inadequately supervised patient with known homicidal tendencies). Thus, while we reject Appellants' attempt to create a cause of action for ordinary negligence in this case, it is obvious that the legislative pronouncement in the MHMR Act allows for recovery in the case of gross negligence.

¶ 43 Examining the allegations in the complaint, we conclude that they do not establish a case of gross negligence. *See Albright v. Abington Memorial Hospital,* 548 Pa. 268, 696 A.2d 1159 (1997) (gross negligence is defined as flagrant and gross deviation from the ordinary standard of care and where there is no question that gross negligence is not present, summary judgment may be granted to mental health provider); *Willett v. Evergreen Homes, Inc.,* 407 Pa.Super. 141, 595 A.2d 164 (1991) (allegations against mental health and mental retardation service providers were not sufficient to establish gross negligence).

¶ 44 The allegations in the complaint in this case establish that Ferrara unquestionably had engaged in inappropriate and dangerous sexual conduct for years. However, Ferrara participated in home visits for years. The negligence in this case consisted of his release into the custody of his father, who was not competent to control his behavior. The complaint indicates clearly that Sylvia released Ferrara into the father's care. Meanwhile, Sylvia alleged that Group Home made that decision. Nonetheless, it is apparent from our reading of the complaint that Guidance Center did not actually participate in that decision. Furthermore, there no indication that it even knew that there was a risk that Ferrara would be so released.

¶ 45 Sylvia admittedly is Ferrara's legal guardian, and there are no specific allegations in the complaint that Guidance Center would have reason to know that Ferrara would be released into the custody of his incompetent father rather than his legal guardian. Instead, while Appellants make a very general allegation that Guidance Center was negligent in permitting Ferrara to be in his parents' home, their specific allegation is that Sylvia made that decision. Complaint, 11/16/00, at ¶ 14.

¶ 46 Furthermore, in the complaint, there are no clear indications that there were any incidents of sexual assaults in the neighborhood occurring *after* 1984. There is an averment that on an unspecified date in the mid–1980s Ferrara was "suspected" of assaulting a girl at a local church. However, Appellants failed to indicate that this incident occurred after Ferrara's voluntary placement and that Ferrara was on a home visit at that time; they also failed to delineate the factual basis for the suspicion. The purported victim remains unnamed, even by initials, and apparently no charges were brought. In the complaint, Appellants also contend that in the mid–1990s, Ferrara had sexual relations with an underage girl. Again, there is no indication that this activity occurred while Ferrara was on a home visit.

¶ 47 In conclusion, the averments in the complaint, viewed in the light most favorable to Appellants, establish that Ferrara was not able to control his behavior. Nonetheless, there is no indication that his competent guardian could not control his behavior nor is there an indication that Guidance Center knew that Ferrara would be released to his father instead of his guardian. The allegations do not establish the existence of a flagrant and gross deviation from the applicable standard of care.

Thus, we affirm the trial court's refusal to impose liability on Guidance Center in this action.

¶ 48 The appeal at No. 1195 WDA 2001 is affirmed. The appeal at No. 1217 WDA 2001 is quashed.