## Torchia v. Cedar Fair L.P.

C.P. of Lehigh County, no. 2004-C-1573.

*Richard J. Orloski,* for plaintiff.
*Joseph S. D'Amico Jr.,* for defendant.

REIBMAN, *J.,* December 7, 2004—Plaintiff alleges that he drove his automobile to defendant's amusement park, paid $5 to park, and then returned only to find his vehicle stolen. He filed a two-count complaint, seeking to recover against defendant for "breach of [an] implied bailment" and for "negligence." Defendant demurs, arguing that the disclaimer of liability on the parking pass it issued precludes recovery under a bailment theory, and that defendant owed plaintiff no duty such as would warrant recovery for negligence in these circumstances. Because it cannot be said with positive assurance that recovery is impossible under any theory on the facts alleged, the demurrer will be denied and, as explained below, plaintiff given the opportunity to file an amended complaint.

## I.

Preliminary objections in the nature of a demurrer will be sustained "only if, assuming the averments of the complaint to be true, the plaintiff has failed to assert a legally cognizable cause of action." *Kramer v. Dunn,* 749 A.2d 984, 990 (Pa. Super. 2000). (internal quotation marks omitted) Moreover, "[a] demurrer should not be sustained if there is any doubt as to whether the complaint adequately states a claim for relief *under any theory.*" *Sevin v. Kelshaw,* 417 Pa. Super. 1, 7, 611 A.2d 1232, 1235 (1992). (emphasis added) Finally, a court is not con-

strained to the choice of either sustaining or overruling a preliminary objection but, instead, has discretion to permit or require an amended pleading. *Motheral v. Burkhart*, 400 Pa. Super. 408, 413 n.1, 583 A.2d 1180, 1183 n.1 (1990).

Plaintiff alleges that in June of 2002, he drove his 1997 Honda Civic to defendant's amusement park, which contains an area for, more or less, traditional rides and another consisting of a water park. (Pl. compl. at ¶3.) Upon paying $5, he received a parking pass, entitling him to park in a designated area. (*Id.* at ¶5.) The parking pass, which plaintiff appended to his complaint, includes a notation that reads:

"THIS LICENSE LIMITS OUR LIABILITY—PLEASE READ IT. This parking pass is your contract. It licenses you to park one vehicle as directed and acceptance constitutes acknowledgement and agreement to these provisions. Dorney Park & Wildwater Kingdom is not responsible for and assumes no liability for damage to or theft of your vehicle or any articles left in it. ONLY A LICENSE OF A PARKING SPACE IS GRANTED AND NO BAILMENT IS CREATED. NO DORNEY PARK & WILDWATER KINGDOM EMPLOYEE HAS ANY AUTHORITY TO VARY ANY OF THE ABOVE TERMS. MANAGEMENT RESERVES THE RIGHT TO MOVE A VEHICLE; VEHICLES WHICH ARE LEFT OVERNIGHT MAY BE TOWED AT THE OWNER'S EXPENSES." (*Id.* at exhibit B.)

After parking his vehicle, plaintiff locked the car and activated its alarm. (*Id.* at ¶6.) Plaintiff then proceeded to the "Wildwater Kingdom" portion of the park. (*Id.* at

¶7.) About three hours later, plaintiff and his companion changed out of their bathing suits and returned to the parking lot to place their wet clothing in the car. (*Id.* at ¶8.) They again locked the vehicle and activated its alarm, and then went back to the ride-area of the park. (*Id.* at ¶9.) Their recreation completed, the pair then returned to the lot approximately two hours later, only to find the 1997 Civic missing, despite the presence of a security van, bicycle patrol, and video monitoring of the parking lot. (*Id.* at ¶¶10-12.)

The complaint avers that, according to an employee named "George," another patron of the park had informed security personnel that the alarm of a car resembling plaintiff's had sounded in response to an apparent attempt by three persons to break into the vehicle. (*Id.* at ¶13.) George, a member of the bicycle patrol, apparently pulled the vehicle over as the three attempted to drive off. *(Id.)* But after inquiring about the ownership of the vehicle, George evidently permitted the car to leave, despite the fact that no official proof of ownership had been produced. (*Id.* at ¶¶14-15.) Apparently, security personnel took no further action. *(Id.)*

Plaintiff's vehicle was eventually recovered by the police in Newark, New Jersey. (*Id.* at ¶17.) The automobile, "a custom show car," was declared a total loss by plaintiff's insurance carrier whose payment failed to compensate fully for the loss. Plaintiff thus filed suit for the value of the car and its contents, seeking recovery against defendant in Count One for breach of an "implied bailment" and in Count Two for negligence. (*Id.* at ¶¶21-24, 25-27.) As noted, defendant demurs to the complaint, alleging no recovery may be had on the facts alleged.

## II.

### *A.*

There exists, first, the question of whether plaintiff has stated a claim for recovery under an "implied bailment." When a person arranges to park a vehicle in a commercially operated parking lot, one of three relevant legal relationships may arise. *Dunegan v. Apico Inns of Green Tree Inc.,* 356 Pa. Super. 386, 390, 514 A.2d 912, 914 (1986). These include that of a lessor-lessee, a bailor-bailee, and licensor-licensee. *Id.* at 390-92, 514 A.2d at 914-25. In the present case, the debate centers on whether a bailment or a license is at issue.[1] As the Superior Court explained in *Dunegan,* in determining the existence of a bailment, vel non, "[t]he distinguishing factor is the extent to which the parking lot operator has exercised control over the vehicles which have been parked upon its lot." *Id.* at 390, 514 A.2d at 914. If the lot operator "assume[s] control of the cars"—for instance, to move them about within its lot or garage—a bailment exists and the operator, as bailee, owes the patron-bailor a duty of care that includes the prevention of loss or damage to the vehicle. *Id.* If, however, the patron retains control over his car, a licensor-licensee relationship exists: the lot operator enters into a contract with the driver for the limited use of a parking space in exchange for a fee. *Id.* at 391, 514 A.2d at 915. That contract, like any other, depends for its terms upon the particular bargain the parties have entered, which may include terms implied from

---

1. Neither party argues that defendant leased a parking space to plaintiff.

the surrounding circumstances. *Sparrow v. Airport Parking Co. of America,* 221 Pa. Super. 32, 38, 289 A.2d 87, 92 (1972).

## B.

This brief recitation of the relevant legal principles reveals infirmities in the arguments of both parties in respect of the bailment-license debate. Plaintiff alleges he paid $5 to park in a designated lot equipped with video surveillance and a security patrol. Defendant concedes as much, but insists that the terms printed on the parking pass that attempted to disclaim liability and eschew a bailor-bailee relationship preclude recovery. The threshold inquiry, as *Dunegan* instructs, is whether plaintiff ceded control over his vehicle. And because plaintiff did not, no bailment arose. Hence, a licensor-licensee arrangement existed. That does not necessarily mean, however, that defendant owed plaintiff no duty that might allow recovery of damages on these facts.

As of yet, the terms of the contract governing the license are not clear. While the disclaimer, if valid, would certainly prevent recovery, it is not evident from the complaint how and when this information was communicated to plaintiff. Whether the disclaimer became part of the parties' bargain depends on whether it was included in the offer that plaintiff, in fact, accepted. That situation would obtain if plaintiff approached the gate, was informed of the price of parking and the limitation of liability before proffering his $5 in acceptance of the offer. If, however, plaintiff approached the gate uninformed of the attempt to disclaim liability, paid his

$5, and only thereafter was notified of the limitation, a different legal conclusion may well prevail. But that conclusion pivots on an examination of the attendant facts and circumstances not possible at this stage of the proceedings.

That said, it nevertheless would not be an "implied bailment" that would afford plaintiff relief. As noted, the sine qua non of bailment is the yielding of control. Plaintiff admits he retained control over his automobile throughout his visit to the amusement park. Instead, recovery under Count One on the facts alleged would result, if at all, as consequence of an implied term in the license agreement. That is, as a result of the surrounding circumstances—*i.e.,* the "externals" exhibited by defendant (see Holmes, *The Common Law* at 307, 309 (Dover Ed. 1991))—did plaintiff reasonably conclude, ex ante, that some measure of security would be provided in exchange for his $5? For instance, it is not clear from the complaint as presently styled when exactly plaintiff became aware that video surveillance and a security patrol were provided for the parking area. Plaintiff will thus be afforded the opportunity to re-plead his claim in Count One under a breach-of-contract theory claiming, if the facts support such, that defendant breached an implied term of the parties' bargain. Alternatively, if nothing done by defendant prior to accepting plaintiff's $5 would have reasonably led one in plaintiff's position to conclude that security was part of the deal, recovery may not be had. And it should go without saying that the lenity necessary to adjudicating preliminary objections in the nature of demurrers must not be misconstrued as an invitation for confabulation.

## III.

### *A.*

Plaintiff, in Count Two of his complaint, also seeks recovery for negligence. He avers that by "allow[ing] plaintiff's vehicle to be ransacked and damaged while in view of its security people and video camera," defendant breached the duty of care owed to him. He alleges that defendant should have taken additional steps to stop the theft, identify the operator, or call the local police. Defendant objects, arguing that as a mere licensor it had no duty to guard against theft by third persons.

One of the most peculiar and, to many, dissatisfying aspects of the common law is the general principle that one owes no duty to come to the aid of another to alleviate or otherwise forfend harms perpetrated by third persons. *E.g., Zayc v. John Hancock Mutual Life Insurance Co. of Boston,* 338 Pa. 426, 433, 13 A.2d 34, 38 (1940). Indeed, it remains accepted as hornbook law that courts will not "impose on a stranger the moral obligation of common humanity to go to the aid of another human being who is in danger, even if the other is in danger of losing his life." Prosser and Keeton on Torts, at ch. 9, §56 (Fifth ed. 1984). There exist, however, important exceptions to the general rule. Those circumstances arise when "the defendant stands in some special relationship with either the person whose conduct needs to be controlled or . . . with the intended victim of the conduct, which gives the intended victim a right to protection." *Rabutino v. Freedom State Realty Co. Inc.,* 809 A.2d 933, 938 (Pa. Super. 2002). (internal quotation marks omitted)

The duty owed by the proprietor of a business to a business invitee has been recognized in this Commonwealth as one such exception. *Id.* Embracing the Restatement (Second) of Torts, §344, the Superior Court has held:

"A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such purpose, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to

"(a) discover that such acts are being done or are likely to be done, or

"(b) give a warning adequate to enable the visitors to avoid the harm, or otherwise protect them against it. . . .

"Since the possessor is not an insurer of the visitor's safety, he is ordinarily under no duty to exercise any care until he knows, or has reason to know, that the acts of the third person are occurring or are about to occur. He may, however, know or have reason to know, from past experience, that there is a likelihood of conduct on the part of third persons in general which is likely to endanger the safety of the visitor, even though he has no reason to expect it on the part of any particular individual . . . ." *Rabutino, supra,* 809 A.2d at 939 (quoting Restatement (Second) of Torts §§344, 344 comment f).

Although it has not been expressly adopted by Pennsylvania's appellate courts, the Restatement (Second) of Torts §302B echoes that principle, extending it explicitly to criminal conduct of third parties. It provides: "An

act or omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal." *Id.* While at odds with the general common-law reluctance to impose liability for *non-* as opposed to *mis*feasance, the comment explains, "There are, however, situations in which the actor as a reasonable man is required to anticipate and guard against the intentional or even criminal misconduct of others. In general, these situations arise where the actor is under a special responsibility toward the one who suffers the harm, which includes the duty to protect him against such intentional misconduct." *Id.* at cmt. e. Examples wherein such a special responsibility exists include situations "[w]here the actor stands in such relation to the other that he is under a duty to protect him against such misconduct. Among such relations are those of carrier and passenger, innkeeper and guest, employer and employee, possessor of land and invitee, and bailee and bailor." *Id.*

Considering those principles in the context of the present case, two questions immediately arise. First, does the classification of plaintiff as a licensee, reached in the previous discussion, preclude consideration of plaintiff as a business invitee for purposes of sections 302B and 344 of the Restatement? Cf. *Rossino v. Kovacs,* 553 Pa. 168, 172-73, 718 A.2d 755, 757 (1998) (observing under Restatement (Second) of Torts §342, duty owed to licensee concerns only physical harm caused by condition on the land). Second, do the rules as articulated in the Restatement contemplate damages to chattels as well as bodily injury?

Turning to the first query, the higher courts have generally defined the duty owing to a visitor upon land according to his status, be it as trespasser, licensee, or invitee. *Cresswell v. End,* 831 A.2d 673, 675 (Pa. Super. 2003). The duty owed to a trespasser is, in Pennsylvania, very limited: the landowner must only refrain from wanton or willful negligence or misconduct. *Rossino, supra,* 533 Pa. at 172, 718 A.2d at 756. A landowner's duty respecting a licensee concerns only physical harm caused by "a condition on the land," as opposed to harm occasioned by other persons. *Id.* at 172-73, 718 A.2d at 757. Thus, only the invitee enjoys the right as set forth in *Rabutino, supra,* to protections vis-à-vis third parties.

"An invitee is either a public invitee or a business visitor." *Cresswell, supra,* 676 A.2d at 675 (quoting Restatement (Second) of Torts §332). In distinguishing between a visitor's status as an invitee versus that of licensee, the focus trains on the distinction between invitation and "mere permission." *Id.* at 676 (quoting Restatement (Second) of Torts §332 comment b). As the Superior Court more fully elaborated: "An invitation differs from mere permission in this: an invitation is conduct which justifies others in believing that the possessor *desires* them to enter the land; permission is conduct justifying others in believing that the possessor is *willing* that they shall enter *if they so desire.*" *Id.* (emphasis in original) A business visitor is, in turn, defined as "a person who is invited to enter or remain on the land for a purpose directly or indirectly connected with business dealings with the possessor of the land." *Id.* (quoting Restatement (Second) Torts §332 comment b).

With that as the touchstone, it readily appears that in the special circumstances of this case—involving, as it does, an amusement park operator who not so coincidentally operated a parking lot for the convenience of its paying customers—plaintiff's status on defendant's land consisted of an invitee. As is reasonably inferable from the complaint, plaintiff's arrival, albeit in his automobile, at the parking lot gates and his subsequent presence on defendant's land both within the park and on the adjacent "designated parking area," was more than tolerated by defendant as an incident of plaintiff's patronage of the park. And the fact that the particular arrangement as concerned the parking of the automobile would, without more, remain one of licensor-licensee, does not define for all purposes defendant's broader relationship with paintiff with respect to the latter's status on the land.

That the contract concerning the parking of an automobile might constitute one of licensor-licensee while the legal status of a plaintiff's broader presence on a defendant's grounds—which subsume both an amusement area as well as a parking lot—amounts to that of a business invitee should give no pause. The apparent inconsistency can be explained by realizing that the traditional licensor-licensee relationship under a contract confined to parking concerns only permission to enter the land with an automobile. But in the broader context of a parking lot owned by the proprietor of an amusement park—who operated both as part of a broader, unified business—the visitor's individual presence is surely desired on both. The customer utilizes the lot as a necessary and, from the defendant's perspective, certainly desirable component of patronizing the park. It is not unreasonable to infer that

persons in plaintiff's position are more than tolerated; they have been sought out and, through advertising and other inducements, their presence enticed. And once there, the duty owing to them as invitees may not be limited by the happenstance that they arrived by automobile. From the time of their arrival as patrons of the park—for, if, as is inferable from the complaint, this parking lot served no other purpose or population—the protections owing to business invitees attached.

For that reason, *Dunegan, supra,* 356 Pa. Super. at 393-94, 514 A.2d at 916, although otherwise on point in respect of the licensor-licensee relationship, is not controlling on this question. In that case, the court addressed, on summary judgment, only the express and implied *contractual* liability of an hotelier qua parking-space provider. *Id.* at 394, 514 A.2d at 916. Thus, it left unaddressed the question confronted here, which concerns liability imposed as a matter of *social duty* as a consequence of the special relationship between a proprietor and his business visitor. The fact that a plaintiff suffers harm on the parking lot as opposed to the establishment proper is not determinative. See *e.g., Murphy v. Penn Fruit Co.,* 274 Pa. Super. 427, 431-34, 418 A.2d 480, 481-84 (1980) (finding section 344 applicable to plaintiff injured by third person on defendant's parking lot). The question of whether recovery is possible on the facts alleged in this case thus turns to the extent those protections extend to a plaintiff's chattels as well as his person.

### B.

In view of the allegation that defendant witnessed a theft in progress, the conclusion that the duty owed to a

business invitee extends to his belongings as well as his body finds support in considerations of lexicography, precedent, and policy. As seen in the passage quoted above, the relevant section of the Restatement, cited with approval by the Commonwealth's higher courts, speaks of "physical harm" caused by third persons or animals. *Rabutino,* 809 A.2d at 939 (quoting Restatement (Second) of Torts §344). Physical harm is commonly understood in the law to mean "[a]ny physical impairment of land, *chattels,* or the human body." Black's Law Dictionary, at 722 (Seventh ed. 1999) (emphasis added); see also, *Sharon Steel Corp. v. DeLeval Turbine Inc.,* 4 D.&C.3d 325 (Mercer Cty. 1977) ("physical harm" as used in Restatement (Second) of Torts §324A includes physical impairment of human body, land, or chattels but not consequential and purely economic loss). Under that definition, then, the business proprietor's obligation to "warn" or "otherwise protect" its visitors, *Rabutino* at 939 (quoting Restatement (Second) of Torts §344), encompasses damages to their property as well as their persons.

Although the reported case law in Pennsylvania appears silent on this precise point, other jurisdictions have applied the principle articulated in section 344 to property as well as bodily injury. For instance, construing South Dakota law, the federal district court held that breach of the duty owed to business invitees rendered the operator of an airport liable for failure to warn of a dangerous condition that resulted in the loss of an airplane. *Safeco Insurance Co. of Am. v. City of Watertown S.D.,* 529 F. Supp. 1220, 1226-29 (D.S.D. 1981); see also, *Lacelle v. Hills Dept. Store,* 535 N.Y.S.2d 1014, 1017

(N.Y.C. Civ. Ct. 1988) (holding merchant liable under Restatement (Second) of Torts §344 for purse stolen from shopping cart).

Policy considerations also militate in favor of recognizing a proprietor's liability for physical harm to a business invitee's chattels, whether under section 344 or section 302B. As explained by our Supreme Court in *Gardner v. Consolidated Rail Corp., SEPTA, infra,*

"In determining the existence of a duty of care, it must be remembered that the concept of duty amounts to no more than the sum total of those considerations of policy which led the law to say that the particular plaintiff is entitled to protection from the harm suffered. . . . To give it any greater mystique would unduly hamper our system of jurisprudence in adjusting to the changing times. The late Dean Prosser expressed this view as follows:

" 'These are shifting sands, and no fit foundation. There is a duty if the court says there is a duty; the law, like the constitution, is what we make it. Duty is only a word with which we state our conclusion that there is or is not to be liability; it necessarily begs the essential question. When we find a duty, breach and damage, everything has been said. The word serves a useful purpose in directing attention to the obligation to be imposed upon the defendant, rather than the causal sequence of events; beyond that it serves none. In the decision whether or not there is a duty, many factors interplay: The hand of history, our ideas of morals and justice, the convenience of administration of the rule, and our social ideas as to where the loss should fall. In the end the court will decide whether there is a duty on the basis of the mores of the community, always keeping in mind the fact that we

endeavor to make a rule in each case that will be practical and in keeping with the general understanding of mankind.' " 524 Pa. 445, 454-55, 573 A.2d 1016, 1020 (1990). (internal citations and quotation marks omitted)

And as elaborated further by the Superior Court, relevant factors in considering the existence of duty in any specific set of circumstances include "(1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; (5) the overall public interest in the proposed solution." *F.D.P. v. Ferrara,* 804 A.2d 1221, 1231 (Pa. Super. 2002). Should a duty be established, the level of care necessary to discharge that duty will depend on the *"realities of the situation"* confronted. *Clewell v. Pummer,* 384 Pa. 515, 523, 121 A.2d 459, 464 (1956). (emphasis in original)

Without question, in this case, defendant as a business-operator entered into a special relationship with his invitee, plaintiff. Surely, the law should not countenance a situation in which a business owner may invite the public onto his property for his pecuniary benefit and then, upon learning that his customer's goods are being pilfered, sit idly by, absent any duty to mitigate the harm. This conclusion appears all the more compelled when, as alleged here, the particular risk of harm to which plaintiff has been exposed is at least to some degree enhanced by the proprietor's activities. It appears self-evident that any common thief would realize the increase in fodder for his untoward activities when the potential objects of his crimes are collected in greater concentration. A parking lot full of automobiles whose owners will be pre-

dictably detained in amusement activity of some duration thus provides a relatively ripe target for car thieves. Thus, in the circumstances here pled, it makes eminent sense to recognize that the proprietor of a unified operation that entails parking and an amusement park assumes a duty consistent with that set forth in the Restatement (Second) of Torts §§302B and 344 to guard against physical harm to his invitees. And, while a line might be drawn at the boundaries of the visitor's body in the name of expediency, logic and sound considerations of policy demand that the duty should extend to foreseeable or known harm occurring to the visitors' property, as well. Here, then, a car as chattel of the customer does not differ significantly from, say, a purse left temporarily unattended in a shopping cart. See *Lacelle, supra,* 535 N.Y.S.2d at 1017 (holding proprietor liable for customer's purse under Restatement (Second) of Torts §344).

The argument might be made that recognition of such an obligation on business owners, such as the defendant in this case, who are faced with actual knowledge will lead to a disincentive for proprietors to engage in prophylactic security measures out of fear that actual knowledge of such activities might result in liability upon the failure to successfully thwart the evil. In other words, it might be posited that a proprietor, aware that actual knowledge of an unfolding harm to one of his customers or their property will result in a duty to act, may choose instead to remain oblivious. Thus, he will desist from offering gratuitous security measures that he otherwise may have employed, such as surveillance cameras or security patrols. Upon scrutiny, however, such an argument proves unpersuasive.

As noted, the law as formulated in the Restatement imposes a duty in the case of actual *or foreseeable* knowledge. Accordingly, the proprietor who chooses to do nothing in the hopes of remaining ignorant will nonetheless acquire the requisite scienter once such crimes occur on his property. In the meantime, his good will will have been reduced commensurate with the circulation of news among the buying public that his establishment is a dangerous place to visit. By contrast, the owner who takes the initiative to prevent such occurrences will be more likely to become aware of events presently unfolding, but presumably will also benefit from the deterrent effect his security measures have provided in preventing physical harm to his patrons and their property. In the final analysis, then, the trade-off appears to reduce itself into a comparison between, on the one hand, the few free passes the passive proprietor will receive by doing nothing and remaining ignorant until after his customers have been victimized—and the concomitant loss of good will which results—and, on the other, the gain in good will the assertive merchant will realize by deterring harm in the first instance—at the price of incurring a duty to exercise reasonable care in those first few situations that his security measures bring to his attention. Because the same duty ultimately devolves on both classes of merchants, and the price paid by the conscientious proprietor results in additional benefits to the public not otherwise realized, any perverse incentives appear illusory. Accordingly, policy considerations weigh heavily in favor of recognizing a duty upon business owners with respect to their invitees in circumstances, such as presented here, where by virtue of security meas-

ures a proprietor has reason to know his customer's property is in immediate peril.

## C.

Finally, there remains yet a third theory upon which defendant owed a duty to plaintiff on the facts alleged. The courts of this Commonwealth have undoubtedly established that, although one might be under no duty to act, once such a task is assumed, it carries with it the obligation that it be performed non-negligently. *E.g., Feld v. Merriam,* 506 Pa. 383, 485 A.2d 742 (1988) (adopting Restatement (Second) of Torts §323).

Here, as noted, plaintiff alleges that defendant's security personnel indeed questioned the thieves but erroneously let them exit the parking lot with his vehicle. To what extent there was any dereliction of duty in these circumstances is not clear at this incipient stage of the proceedings. What appears certain, however, is that, upon assuming the initiative to intervene in the unfolding theft, defendant had the responsibility to act in a reasonable fashion. If, for no other reason, that remains true because, like the situation surrounding the attempted but negligent rescue, the intervention of the actor may well lead others to refrain from acting in the belief that the situation is under control and, therefore, the assistance of others is no longer necessary. It requires little extrapolation to conclude that similar conditions might exist in the context of an attempted automobile theft, as alleged here. Certainly, any otherwise altruistic passersby would likely, upon seeing or, indeed, notifying security personnel of ostensible thieves, assume that the situation was now well in hand. Thus, they may well conclude that they need

not notify the police or otherwise intervene. Because plaintiff, in fact, alleges that defendant's failure to phone the local police constituted one facet of the breach of duty, he must be considered to have stated a claim for negligence in the undertaking of a duty, even if it was one only gratuitously assumed.

## D.

In view of all of this, whether plaintiff may recover under a theory of negligence remains unclear. As noted, once a duty arises, the specific conduct necessary to fulfill that obligation depends on the *"realities of the situation"* as confronted by a defendant. *Clewell, supra,* 384 Pa. at 523, 121 A.2d at 464. (emphasis in original) What can be said, however, is that his claim in Count Two cannot be dismissed on the grounds that defendant owed him no duty based on the facts alleged in the complaint. It thus awaits further development of the underlying events to ascertain whether defendant breached the duty owed to plaintiff. First, what defendant through its agents actually knew or, in consideration of the circumstances, should have known proves pivotal in defining the precise contours of that duty. Second, what precisely defendant did in response will determine whether it exhibited the requisite level of care. Thus, defendant's contention, for instance, that it had no duty—or even authority—to detain the thieves may ultimately prove correct. Suffice it to say for present purposes, however, that if the facts prove to be as alleged by plaintiff in his complaint, it may also be that defendant's actions fell short of the duty owed to plaintiff and thereby proximately caused his

damages. The preliminary objection to Count Two in the nature of a demurrer will thus be overruled.

## IV.

In light of the above, defendant's demurrer to Count One of plaintiff's complaint will be denied. Defendant's objection will, however, be sustained as a demand for a more specific pleading. Accordingly, plaintiff may file an amended complaint that sets forth more specific facts which, if they exist, would warrant recovery under a breach-of-contract theory. As to Count Two, defendant's demurrer will be denied; whether a claim in negligence ultimately will lie rests on a determination of facts inapposite to judgment at this preliminary phase of the proceedings.

## ORDER

And now, December 7, 2004, upon consideration of defendant's preliminary objections, filed on July 9, 2004, and plaintiff's response thereto, filed on July 27, 2004, and for the reasons set forth in the accompanying opinion, it is ordered that said preliminary objections are sustained in part and overruled in part; it is further ordered that, consistent with said opinion, plaintiff shall have 20 days to file an amended complaint.