**COMMONWEALTH of Pennsylvania,**
**Appellant,**

v.

**James Lincoln STRONG, Appellee.**

Superior Court of Pennsylvania.

Submitted Oct. 7, 2002.
Filed April 23, 2003.
Reargument Denied July 2, 2003.

David W. Lupas, Asst. Dist. Atty., Wilkes-Barre, for Com., appellant.

Demetrius W. Fannick, Kingston, for appellee.

Before: MUSMANNO, GRACI and MONTEMURO *, JJ.

MONTEMURO, J.

¶ 1 Both the Commonwealth of Pennsylvania and James Lincoln Strong appeal the pretrial Orders entered in the Luzerne County Court of Common Pleas, granting in part and denying in part the parties' motions to preclude certain evidence at Strong's retrial for the 1983 murder of John Strock.

¶ 2 The trial court summarized the relevant facts and procedural history underlying this appeal as follows:

> This case involves the slaying of John Henry Strock on August 18, 1983 in Luzerne County, Pennsylvania. The Defendant, James Lincoln Strong, was charged ... with the crimes of Criminal Homicide, 18 Pa.C.S.A. § 2501(a), Kidnapping, 18 Pa.C.S.A. § 2901(a)(2), Robbery, 18 Pa.C.S.A. § 3701(a)(1)(i), and Theft by Unlawful Taking, 18 Pa.C.S.A. § 3921(a).

> [Strong] testified on his own behalf at trial and denied his involvement in the homicide of [Strock]. The Commonwealth at the said trial relied primarily on the testimony of one James Alexander. [Alexander] was a principal and alleged eyewitness to the slaying of [Strock]. [Alexander], who cooperated with the law enforcement authorities in the investigation of this criminal episode, has since passed away.

> The original trial ... produced the following facts of record for our background. On August 18, 1983, [Strock] was driving a white Ford Grenada along Route 81 in Green Castle, Pennsylvania.

---

* Retired Justice assigned to Superior Court.

[Strock] stopped the car on the side of the road and offered a ride to two hitch-hikers, [Strong] and [Alexander]. According to the trial testimony of [Alexander], Alexander sat in the front seat and Strong sat in the backseat. Alexander testified that he promptly fell asleep.

When Alexander woke, he observed Strong produce a .20 gauge sawed-off shotgun and rest it upon [Strock's] shoulder. Strong directed [Strock] to pull the car to the side of the road and exchange seats with Alexander, so that Alexander could drive the car. After driving for some time, Alexander pulled the car to the side of the road along an isolated stretch of interstate 81. Alexander walked into the woods a few steps in order to relieve himself. When Alexander returned to the car, Strong and [Strock] were not present. Alexander then heard a gunshot. Approaching the sound of the gunshot, Alexander saw that [Strock] had been shot and his body had fallen into a gully. Strong was holding the shotgun. Alexander asked Strong why he had shot [Strock]. Strong replied that he was tired of leaving witnesses behind. Strong directed Alexander to go through [Strock's] pockets. Alexander complied, handing the items to Strong. Strong then directed Alexander to shoot [Strock]. Alexander refused and began walking back to the car when he heard another gunshot.

Alexander and Strong got into the Ford Grenada and continued their journey. Strong and Alexander ultimately abandoned [Strock's] Grenada when it ran out of gas. Strong and Alexander continued hitchhiking until they were apprehended in Pottsdam, New York. At the time of the arrest, the officers discovered a .20 gauge sawed-off shotgun. While in custody of the New York police, Alexander agreed to cooperate with authorities and assist them in locating [Strock's] body. Upon returning to Pennsylvania, Alexander assisted the Pennsylvania State Police in locating the body.

[Strong] was convicted of first-degree murder and sentenced to death on October 30, 1984. The judgment of sentence was affirmed in *Commonwealth v. Strong*, 522 Pa. 445, 563 A.2d 479 (1989), cert. denied, 494 U.S. 1060, 110 S.Ct. 1536, 108 L.Ed.2d 775 (1990).

In 1995 Strong filed a pro se petition seeking post-conviction relief. Counsel was appointed to assist Strong and an amended petition was filed. Evidentiary hearings were held on April 7th and 8th, and May 8th, 1997. On June 30, 1998 the lower court denied the petition for PCRA relief. [Strong] appealed. The Supreme Court accepted the appeal and held that the Commonwealth's failure to disclose an understanding it had with a key witness in the case, James Alexander, was in violation of the mandates of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Accordingly, the case was reversed and remanded to [the trial court] for a new trial.

(Trial Ct. Op. at 1–3) (citations to transcript omitted).

¶3 On remand, both Strong and the Commonwealth filed pretrial motions. Strong's motion sought (1) the dismissal of the charges based on double jeopardy grounds; (2) the preclusion of Alexander's prior testimony at Strong's first trial; and (3) the preclusion of evidence of Strong's alleged prior bad acts. In response, the Commonwealth's motion sought, *inter alia*, (1) the admission of Alexander's prior testimony from both Strong's trial and PCRA hearing; (2) the admission of evidence of prior crimes committed by Strong in 1969, 1975, and 1983; and (3) the admission of

Strong's testimony from his first trial. On August 6, 2001, the trial court conducted a hearing on the issues raised in both motions. That same day, the court entered an order, *inter alia,* denying Strong's motion to preclude the evidence of a similar crime committed by Strong in 1983, but granting Strong's motion to preclude the evidence of other similar crimes committed in 1969 and 1975. The court also held several issues under advisement. On September 4, 2001, the trial court filed an Order and Opinion disposing of the remaining pretrial claims. Specifically, the court ruled (1) that Strong's double jeopardy claim was meritless; (2) that Alexander's testimony from the prior trial and PCRA hearing was inadmissible; and (3) that Strong's prior trial testimony was admissible. On September 5, 2001, the Commonwealth filed a Notice of Appeal from the court's August 6th Order. Thereafter, on October 1 and October 4, 2001, respectively, both the Commonwealth and Strong filed appeals from the court's September 4th Order. The appeals were consolidated by Order of this Court dated February 21, 2002.

¶ 4 In its appeal, the Commonwealth raises two issues: (1) whether the trial court erred in precluding the prior trial and PCRA hearing testimony of an unavailable Commonwealth witness; and (2) whether the trial court erred in excluding evidence of prior crimes committed by Strong in 1969 and 1975.[1] Strong raises three issues in his appeal: (1) whether the trial court erred in admitting evidence of a prior bad act which occurred in 1983; (2) whether the trial court erred in admitting his testimony from his first trial as sub-

stantive evidence at retrial; and (3) whether the trial court erred in denying his motion to dismiss the charges based on double jeopardy.[2] We will address these issues seriatim.

¶ 5 First, the Commonwealth argues that the trial court erred in precluding the prior trial and PCRA hearing testimony of deceased Commonwealth witness James Alexander. Pursuant to 42 Pa. C.S.A. § 5917, the former testimony of a witness in a criminal proceeding who has since died is competent evidence admissible in a subsequent trial of the same criminal issue. *See also* Pa.R.E. 804.1. The Supreme Court has held, however, "that in order for a witness's prior testimony to be admissible pursuant to Section 5917, the defendant against whom the testimony is to be admitted at a subsequent proceeding must have been afforded **a full and fair opportunity to cross-examine the witness** at the first proceeding." *Commonwealth v. Chmiel,* 558 Pa. 478, 738 A.2d 406, 417 (1999), *cert. denied,* 528 U.S. 1131, 120 S.Ct. 970, 145 L.Ed.2d 841 (2000) (emphasis added). In addition, the issues in both proceedings must remain the same "such that the present opponent ... had an adequate motive for testing on cross-examination the credibility of the testimony now offered." *Id.* (quoting *Commonwealth v. Velasquez,* 449 Pa. 599, 296 A.2d 768, 770 n. 3 (1972) (internal quotation omitted)).

¶ 6 Here, Alexander, a key Commonwealth witness, testified at Strong's first trial, and denied that his testimony was in exchange for favorable treatment by the Commonwealth, despite the fact that he too was facing trial on the kidnapping and

---

**1.** We note that the Commonwealth has complied with the dictates of Pa.R.A.P. 311(d) and *Commonwealth v. Dugger,* 506 Pa. 537, 486 A.2d 382 (1985), and included in both notices of appeal a certification that the order termi-

nates or substantially handicaps its prosecution. Therefore, its appeals are proper.

**2.** We have renumbered Strong's issues for purposes of disposition.

murder of Strock. During Strong's PCRA hearing, however, Alexander admitted without hesitation that he had lied during Strong's trial, and that he had an understanding with the Commonwealth that he would receive a lenient sentence in exchange for his testimony. *See* N.T. PCRA Hearing, 4/7/97, at 14–16. Alexander has since died.

¶ 7 The trial court concluded that Alexander's prior testimony was inadmissible at retrial because Strong did not have a full and fair opportunity to cross-examine Alexander at his first trial:

> Although he was cross-examined by Strong's counsel at trial, counsel was not armed with the impeachment evidence of Alexander's understanding with the Commonwealth that he would be treated with considerable leniency in exchange for his testimony. Impeachment evidence which goes to the credibility of a primary witness against the accused is critical evidence and it is material to the case whether that evidence is merely a promise or an understanding between the prosecution and the witness.

(Trial Ct. Op. at 16). Indeed, as the trial court noted, "[t]his impeachment evidence is of even greater import to the present case when one considers that Alexander was the only witness to put the gun in Strong's hand at the moment of the murder." (*Id.* at 17). *See Commonwealth v. Bazemore,* 531 Pa. 582, 614 A.2d 684 (1992) (holding defendant was deprived of full and fair opportunity to cross-examine presently deceased key Commonwealth witness at preliminary hearing when defendant not aware at that time that witness had given prior inconsistent statement, that witness had prior criminal record, and that Commonwealth was considering filing charges against witness for same incident).

¶ 8 The Commonwealth contends, however, that the trial court failed to consider Strong's cross-examination of Alexander at the PCRA hearing. Indeed, it argues "when Alexander's prior trial testimony is read in combination with his prior post conviction testimony, it is apparent that counsel for Strong had a full and fair opportunity to cross-examine this now unavailable witness[.]" (Appellant's Brief at 11).

¶ 9 We agree that in most cases, and in all of those reported to date, the only courtroom testimony by the unavailable witness is from a single prior trial or proceeding. Generally, the witness becomes unavailable before he or she is confronted with vital impeachment evidence. This case, however, is unique. Although Strong was not able to cross-examine Alexander at trial regarding his purported agreement with the Commonwealth, he was able to question Alexander about the agreement during the PCRA hearing. The fact that this interrogation was in the form of a direct examination, rather than cross-examination, is of no moment. Rather, the critical point is that Strong was given the opportunity to confront Alexander regarding his expectation of leniency in exchange for his testimony. As the Pennsylvania Supreme Court stated in *Commonwealth v. Evans,* 511 Pa. 214, 512 A.2d 626 (1986):

> Even if the prosecutor has made no promises, either on the present case or on other pending criminal matters, the witness may hope for favorable treatment from the prosecutor if the witness presently testifies in a way that is helpful to the prosecution. And if that possibility exists, the jury should know about it.
>
> The jury may choose to believe the witness even after it learns of actual promises made or possible promises of leniency which may be made in the fu-

ture, but the defendant, under the right guaranteed in the Pennsylvania Constitution to confront witnesses against him, must have the opportunity at least to raise a doubt in the mind of the jury as to whether the prosecution witness is biased.

*Id.* at 631–32 (footnote omitted).

¶ 10 Moreover, this is not a situation in which the Commonwealth is attempting to introduce impeachment information indirectly. *See Bazemore, supra* at 687 n. 4 (introduction of presently unavailable witness' prior inconsistent statement at trial, along with witness' preliminary hearing testimony, "inadequate substitute for a full and fair opportunity" for defendant to examine witness herself); *Commonwealth v. Smith,* 436 Pa.Super. 277, 647 A.2d 907, 912 (1994) (Commonwealth's proposed stipulation to facts concerning presently unavailable witness' prior criminal history and pending charges, not revealed to defendant at preliminary hearing, inadequate substitute for cross-examination of witness at trial). Here, Strong had the opportunity to confront Alexander regarding his expectation of leniency, and Alexander admitted without hesitation that he had lied during Strong's trial:

Q [by defense counsel] Mr. Alexander, at the time that you testified against this gentleman, Mr. Strong, what was your understanding that you had with the Commonwealth of Pennsylvania?

A That I'd receive a minimum sentence.

Q Mr. Alexander, do you remember being asked at Mr. Strong's trial whether or not you had any agreements with the Commonwealth of Pennsylvania?

A At the time, I said none.

Q That was not accurate, was it, sir?

A No, sir.

Q Why did you say that, Mr. Alexander?

A Because the prosecution told me not to say anything about the deal we had.

\* \* \*

Q Mr. Alexander, when you said "the prosecutors," when you said these people told you not to say anything about the agreement you had, do you know the names of these individuals who said that?

A I think it was Mr. Gillespie [the District Attorney] and also my lawyer.

\* \* \*

Q [by Commonwealth] Are you aware that you just got on the stand and admitted to perjury?

A Yes, sir.

Q You're admitting to that?

A Yes, sir.

\* \* \*

Q And later on at [page] 1253 in the official trial transcript and you testified whether you had any immunity or any deals and you answered no; that was a lie?

A Right.

Q And at [pages] 1303, 1304 and 1305 when you were asked about whether or not there was an agreement, again you lied, is that correct?

A Yes.

Q And at [page] 1335 when someone says, Did someone tell you what to say? And you said no one told you what to say, that you were here because you wanted to tell the truth, that was a lie, too?

A Yes.

(N.T. PCRA hearing, 4/7/97, at 14–16, 25).

¶ 11 Finally, although Alexander's prior testimony will be extracted from two different proceedings, the issues in both remained the same as required by *Chmiel,*

*supra.* Central to both proceedings was Alexander's perception of an agreement with the Commonwealth, that is, his testimony in exchange for leniency. Indeed, failure to disclose Alexander's expectation of leniency was the Commonwealth's *Brady* violation, and is vital impeachment information bearing on his testimony against Strong at trial. Therefore, we conclude that the trial court erred in excluding Alexander's former testimony, both at trial and at the PCRA hearing, from admission at retrial, and accordingly, reverse that portion of the trial court's September 4, 2001, Order holding to the contrary.

■ ¶ 12 Next, the Commonwealth contends that the trial court erred in granting, in part, Strong's motion to preclude evidence of other crimes which occurred in 1969 and 1975. Specifically, the Commonwealth argues that the evidence was admissible to establish a common plan, scheme, or design routinely used by Strong to victimize lone motorists. The trial court, however, in precluding the evidence, found that it did not serve to prove a common plan, scheme, or design, and, even if it did so, its probative value was outweighed by the potential for prejudice. *See* N.T. Pretrial Hearing, 8/6/01, at 69–71.

■ ¶ 13 It is well-established that a trial court has broad discretion in admitting or excluding evidence, and that we may not reverse an evidentiary ruling absent an abuse of that discretion. *Commonwealth v. Minerd,* 562 Pa. 46, 753 A.2d 225, 229 (2000). When, as here, the trial court indicates its reason for its ruling, our scope of review is limited to an examination of that stated reason. *Id.*

■ ¶ 14 Although evidence of other crimes committed by a defendant is generally inadmissible at trial, such evidence may be relevant and admissible for certain purposes, such as establishing the identity of the perpetrator or demonstrating the existence of a common plan, scheme, or design. *Commonwealth v. Bronshtein,* 547 Pa. 460, 691 A.2d 907, 915 (1997), *cert. denied,* 522 U.S. 936, 118 S.Ct. 346, 139 L.Ed.2d 269 (1997). *See* Pa.R.E. 404(b)(1)-(2).

> The existence of a common scheme is relevant to establish any element of a crime (e.g. the identity or intent of the perpetrator) so long as it does not merely indicate the defendant's propensity to commit similar crimes. In order for other crimes evidence to be admissible under this exception, a comparison of the crimes must establish a logical connection between them.

*Bronshtein, supra* at 915–16 (citations omitted). Moreover, such evidence is admissible in a criminal case "only upon a showing that the probative value of the evidence outweighs its potential for prejudice." Pa.R.E. 404(b)(3).

¶ 15 The Commonwealth sought to introduce the following evidence of past crimes committed by Strong:

### *Russel James, July 4, 1969*

On July 4, 1969, Russel James was stopped for a traffic light at an intersection in Baltimore, Maryland. Two men, one of whom was Strong, approached him and placed a gun to his head. James was told to move over and the two assailants then got into the car, one in the driver's seat, the other in the front passenger's seat. They drove to a wooded area where James was removed from the car and relieved of his wallet. The two assailants then drove off in Jame's [sic] car. Strong was arrested in November of 1969 and convicted of robbery with a dangerous and deadly weapon and kidnap[p]ing. He was sentenced to ten (10) years in a Maryland correctional facility.

### *Charles Graham, July 12, 1969*

On July 12, 1969, Charles Graham picked up two hitchhikers in Baltimore County, Maryland. Strong was identified as one of the hitchhikers. After a period of time had passed, the assailants produced weapons, including a pistol, and told Graham to move from behind the steering wheel. They then drove to an isolated area where Graham was removed from the car. Once out of the car, Graham was robbed of his wallet, jewelry and the car. Graham was then stabbed and left for dead while Strong and his partner drove away in Graham's car. Strong was eventually apprehended, convicted of assault with intent to murder and sentenced to ten (10) years in a Maryland correctional facility. [ ] Graham survived his ordeal.

### Earnest Ocheltree, May 27, 1975

On May 27, 1975, Earnest Ocheltree was traveling Interstate 64 on his way home from Norfolk, Virginia when he saw a hitchhiker, who turned out to be Strong. When Ocheltree approached his exit, Strong produced a weapon, a .22caliber [sic] pistol, and ordered him to continue on Interstate 64. Thereafter, Strong ordered Ocheltree off of the interstate and directed him to turn onto a dirt road. After telling Ocheltree to get out of the car, Strong robbed him of his wallet, placed tape over his mouth and tied Ocheltree to a tree. Strong then took Ocheltree's car and continued to drive east on Interstate 64. Ocheltree eventually freed himself and was able to call police. Strong was later apprehended at the Belvedere toll plaza on Interstate 95 near Richmond, Virginia. Strong had been paroled approximately one (1) year earlier from the Maryland Correctional Facility in Hagerstown. Strong was charged and convicted of robbery and received a fifteen (15) year sentence.

(Commonwealth's Brief at 12–13) (citing N.T. Pretrial Hearing, 8/6/01, at 48–58).

¶ 16 Here, the 1969 and 1975 crimes are distinguishable from each other and from Strock's murder. Specifically, we note that the geographical locations varied and that Strong treated each victim differently. On July 4, 1969, Strong left the victim uninjured in a wooded area. On July 12, 1969, Strong stabbed the victim and left him for dead. On May 27, 1975, Strong placed tape over the victim's mouth and tied the victim to a tree. In the instant case, Strong allegedly shot and killed the victim. These crimes are not so distinctive as a group or so nearly identical to each other to demonstrate the signature of the same perpetrator, as the Commonwealth suggests. *Cf. Bronshtein, supra* at 916 (holding that evidence that the defendant confessed to separate murder was admissible in later murder prosecution to show defendant's identity by virtue of similarities of victims and crimes, and that crimes were committed only five weeks apart); *Commonwealth v. Miller,* 541 Pa. 531, 664 A.2d 1310, 1318 (1995), *cert. denied,* 516 U.S. 1122, 116 S.Ct. 932, 133 L.Ed.2d 859 (1996) (holding that prior crimes of rape and murder were admissible at trial for other murders where crimes occurred over five year period and were similar in manner in which victims were chosen, in geographical location of murders, and in types of wounds inflicted on victims); *Commonwealth v. Reid,* 533 Pa. 508, 626 A.2d 118, 121 (1993) (holding that evidence of subsequent murder was properly admitted at trial for prior murder to establish identity where same gun was used in both crimes); *Commonwealth v. Hughes,* 521 Pa. 423, 555 A.2d 1264, 1283 (1989) (holding that prior rape evidence properly admitted at trial for subsequent rape and murder occurring ten months later where crimes were similar in geographic location, time,

method of attack, and characteristics of victims).

■ ¶ 17 Furthermore, these crimes occurred approximately 8 to 14 years prior to the killing of Strock. Although remoteness in time is a factor to be considered in determining the probative value of prior crimes evidence under the common scheme, plan, or design theory, "the importance of the time period is inversely proportional to the similarity of the crimes in question." *Miller, supra* at 1319. Here, the differences in the crimes coupled with the lapse of time negates the Commonwealth's theory that all four incidents were part of a common scheme, plan, or design. There is no doubt that the evidence has a potential for prejudice which outweighs any probative value. Pa.R.E. 404(b)(3). Thus, we conclude that the trial court properly precluded admission of this information as substantive evidence at retrial.

■ ¶ 18 In his appeal, Strong raises three issues, two of which are not properly before this Court. Strong first contends that the trial court erred in admitting evidence of a "prior bad act," specifically two armed robberies of gas stations in Georgia which occurred over a two day period only nine days prior to the murder here. Following a proffer by the Commonwealth, the trial court ruled that the 1983 incident was admissible to establish Strong's identity as the perpetrator in the instant case. However, we are precluded from addressing this claim for several reasons.

¶ 19 First, Strong never filed an appeal from the trial court's August 6, 2001, Order deciding this issue. Indeed, Strong's Notice of Appeal, filed on October 4, 2001, referenced only the September 4, 2001, Order. *See Commonwealth v. Martin,* 316

Pa.Super. 190, 462 A.2d 859, 860 (1983) ("It is implicit in Pennsylvania Rule of Appellate Procedure 904, which governs the content of the notice of appeal, that the correct date of the order appealed should be included in the notice of appeal."). Second, had Strong attempted to appeal the August 6th Order at the same time as the September 4th Order, that appeal would have been dismissed as untimely filed. *See* Pa.R.A.P. 903(a) (mandating that appeal must be filed within 30 days of entry of order appealed from). Finally, the August 6th pretrial Order denying in part Strong's motion to preclude prior crimes evidence was interlocutory and not appealable, as it did not dispose of all claims and all parties.[3] *See* Pa.R.A.P. 341(b)(2).

■ ¶ 20 Next, Strong challenges the trial court's admission of his testimony from his first trial as substantive evidence at retrial. Again, we find that we have no jurisdiction to entertain this claim. A pretrial order denying a defendant's motion to suppress evidence is interlocutory, and not appealable. *Commonwealth v. Slaton,* 383 Pa.Super. 301, 556 A.2d 1343 (1989), *aff'd,* 530 Pa. 207, 608 A.2d 5 (1992). Perhaps recognizing this jurisdictional impediment, Strong filed a motion requesting that the trial court amend its September 4, 2001, Order to include a determination of finality in accordance with Pa.R.A.P. 341(c). Although the trial court complied with Strong's request, this does not solve the jurisdictional problem *sub judice.*

¶ 21 Rule 341(c) provides, in pertinent part,

> When more than one claim for relief is presented in an action ... or when multiple parties are involved, the trial court ... may enter a final order as to one or more but fewer than all of the claims

---

**3.** Moreover, as will be discussed *infra,* Strong's only recourse would have been to

petition for permission to appeal pursuant to Pa.R.A.P. 1311, which he failed to do.

and parties only upon an express determination that an immediate appeal would facilitate resolution of the entire case. Such an order becomes appealable when entered....

Pa.R.A.P. 341(c). As this Court recently held in *F.D.P. v. Ferrara*, 804 A.2d 1221, 1226 (Pa.Super.2002), "Rule 341(c) certification, under the clear language of the rule, is available only to 'final' orders disposing of one but fewer than all parties or causes of action." Here, the context of the underlying order is interlocutory; finality is not defeated solely by outstanding claims or parties. An interlocutory order, not appealable as of right under Pa.R.A.P. 311, may be appealed only with permission of court pursuant to 42 Pa.C.S.A. § 702(b) and Pa.R.A.P. 312 and 1311. *F.D.P., supra* at 1226. 42 Pa.C.S.A. § 702 requires that, prior to such an appeal, the trial court must expressly determine that the order "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the matter[.]" The procedure for seeking this determination is set forth in Pa.R.A.P. 1311(b):

> Permission to appeal from an interlocutory order containing the statement prescribed by 42 Pa.C.S. § 702(b) may be sought by filing a petition for permission to appeal with the prothonotary of the appellate court within 30 days after entry of such order in the lower court .... An application for an amendment of an interlocutory order to set forth expressly the statement specified in 42 Pa.C.S. § 702(b) shall be filed within the lower court ... within 30 days after entry of such interlocutory order and permission to appeal may be sought within 30 days after entry of the order as amended. Unless the trial court ... acts on the application within 30 days after it is filed, the trial court ... shall no longer consider the application and it shall be deemed denied....

Here, Strong failed to follow the procedures set forth in Rule 1311(b), and petition the trial court to amend its September 4th Order to include a § 702 statement. Therefore, we have no jurisdiction to consider this issue on appeal. *See Commonwealth v. Pfender*, 280 Pa.Super. 417, 421 A.2d 791, 793 (1980) (holding trial court's certification under 42 Pa.C.S.A. § 702(b) that immediate appeal may materially advance ultimate termination of case did not provide this Court with jurisdiction when Commonwealth failed to petition for permission to appeal under Rule 1311).

■ ¶ 22 Finally, Strong contends that the trial court erred in denying his motion to dismiss the retrial on double jeopardy grounds. This issue is appealable. "It is well settled in Pennsylvania that a defendant is entitled to an immediate interlocutory appeal as of right from an order denying a non-frivolous motion to dismiss on state or federal double jeopardy grounds." *Commonwealth v. Calloway*, 450 Pa.Super. 227, 675 A.2d 743, 745 n. 1 (citing *Commonwealth v. Savage*, 388 Pa.Super. 561, 566 A.2d 272, 275 (1989)).

¶ 23 Specifically, Strong argues that retrial is barred in this case by the double jeopardy clause of the Pennsylvania Constitution as interpreted by *Commonwealth v. Smith*, 532 Pa. 177, 615 A.2d 321 (1992). In response, the Commonwealth argues that the *Brady* violation was not the result of bad faith or a specific intent to deny Strong a fair trial. Rather, it was the result of the District Attorney's mistaken belief that because the negotiations with Alexander's counsel did not result in an agreement, he was not required to disclose these negotiations to Strong or to the Assistant District Attorney assigned to pros-

ecute him. The Commonwealth also contends that, despite its failure to disclose the negotiations to Strong, there is no evidence demonstrating bad faith or a specific intent on its part to deny Strong a fair trial.

¶ 24 Strong relies upon *Smith, supra,* in which the Supreme Court instructed that:

> [t]he United States Supreme Court has enunciated principally two types of prosecutorial overreaching. First there is the prosecutorial misconduct which is designed to provoke a mistrial in order to secure a second, perhaps more favorable, opportunity to convict the defendant. Second there is the prosecutorial misconduct undertaken in bad faith to prejudice or harass the defendant. In contrast to prosecutorial error, overreaching is not an inevitable part of the trial process and cannot be condoned. It signals the breakdown of the integrity of the judicial proceeding, and represents the type of prosecutorial tactic which the double jeopardy clause was designed to protect against.

*Id.* at 324 (quoting *Commonwealth v. Starks,* 490 Pa. 336, 416 A.2d 498, 500 (1980)). In *Smith,* the prosecution deliberately withheld for four years clearly exculpatory physical evidence that was crucial to Smith's potentially successful defense. In addition, the Commonwealth continued to seek the death penalty while it concealed the exculpatory material. Finding that "it would be hard to imagine more egregious prosecutorial tactics," *Smith, supra* at 323, the Supreme Court held that "the double jeopardy clause of the Pennsylvania Constitution prohibits retrial ... when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial." *Id.* at 325.

¶ 25 *Smith,* however, does not create a *per se* bar to retrial in all cases involving intentional prosecutorial misconduct. *Commonwealth v. Moose,* 424 Pa.Super. 579, 623 A.2d 831, 836 (1993), *appeal denied,* 538 Pa. 613, 645 A.2d 1317 (1994), *cert. denied,* 513 U.S. 1060, 115 S.Ct. 672, 130 L.Ed.2d 605 (1994). Rather, in order for double jeopardy to bar retrial in these cases,

> there must be a showing that the Commonwealth either (1) goaded the defendant into moving for a mistrial, or (2) specifically undertook to prejudice the defendant to the point of denying him a fair trial. Absent such a showing, retrial is not barred.

*Id.*

¶ 26 In *Moose, supra,* the prosecutor committed misconduct in failing to disclose, until the first day of trial, the statement of a witness to whom incriminating remarks were allegedly made by the defendant while both were in prison, as well as an understanding reached between the government and that witness, whereby the Commonwealth would recommend a lenient sentence for the witness in exchange for his testimony. On direct appeal, this Court reversed, concluding that the Commonwealth's actions violated both the criminal discovery rules and the *Brady* doctrine. *Id.* at 833 (citing *Commonwealth v. Moose,* 393 Pa.Super. 379, 574 A.2d 661 (1990), *aff'd,* 529 Pa. 218, 602 A.2d 1265 (1992)). Prior to retrial, the defendant filed a motion to dismiss the charges based on double jeopardy. This Court held that the Commonwealth's *Brady* violation neither provoked the defendant to move for a mistrial nor intentionally deprived the defendant of a fair trial; therefore, double jeopardy did not bar retrial. *Moose,* 623 A.2d at 836. Furthermore, we concluded that the Commonwealth's misconduct was not equivalent to that in *Smith,* in that there was no specific

intent to deprive the defendant of a fair trial. *Id.*

¶ 27 In this case, the Pennsylvania Supreme Court has already determined that the Commonwealth's failure to comply with *Brady* was a violation of the Fourteenth Amendment of the United States Constitution, *i.e.*, Strong's due process rights were violated by the Commonwealth's failure to disclose the exculpatory information concerning Alexander's credibility. Although, as in *Moose,* the district attorney's behavior "represented a breakdown in our administration of justice," *id.,* the evidence does not support a finding that the Commonwealth specifically intended to deprive Strong of a fair trial. Indeed, as this Court found in *Moose,* "the prosecutor's conduct, while egregious, does not rise to the level of subversive tactics present in *Smith.*" *Id.* at 837. Therefore, *Smith* offers Strong no relief here.

¶ 28 Therefore, we reverse that portion of the trial court's September 4, 2001, Order precluding the prior testimony of deceased Commonwealth witness James Alexander at retrial. In all other respects, we affirm the trial court's August 6, 2001, and September 4, 2001, pretrial Orders.

¶ 29 Orders affirmed in part and reversed in part. Case remanded for proceedings consistent with this Opinion.