**COMMONWEALTH of Pennsylvania,** Appellee

v.

**Jane C. ORIE, Appellant.**

Superior Court of Pennsylvania.

Submitted April 8, 2011.

Filed Aug. 31, 2011.

---

William Costopoulos, Lemoyne, for appellant.

Michael W. Streily, Deputy District Attorney, Pittsburgh, for Commonwealth, appellee.

BEFORE: GANTMAN, LAZARUS, and MUNDY, JJ.

OPINION PER CURIAM:

Petitioner, Jane C. Orie, filed a petition for pre-trial review of the order entered in the Allegheny County Court of Common Pleas, which denied as frivolous her motion to bar any retrial and dismiss the charges against her with prejudice, on double jeopardy grounds. The Supreme Court remanded the matter to this Court with the directive to examine the very limited issue of whether the trial court erred in finding

Appellant's motion was frivolous. Upon review of the record, we affirm the court's finding of frivolousness.

The Supreme Court summarized the facts and procedural history of this appeal as follows:

Petitioner is a Pennsylvania Senator, representing the 40th Senatorial District. Following a grand jury investigation and presentment recommending criminal charges, the Allegheny County District Attorney's Office charged Petitioner with three counts of theft of services, three counts of conflict of interest, one count of conspiracy, and three counts of tampering with or fabricating physical evidence. A jury trial commenced in Allegheny County presided over by the Honorable Jeffrey A. Manning on February 8, 2011. The trial lasted over three weeks and the jury began its deliberations in the late afternoon hours on March 2, 2011.

On March 3, 2011, as the jury was starting its first full day of deliberations, the Commonwealth informed the trial court that it believed there had been a fraud upon the court. The trial court halted jury deliberations. Following the arrival of defense counsel, the Commonwealth alleged that two defense exhibits had been forged. Ultimately, after permitting both parties to argue the appropriate remedy for the alleged forgery and allowing the Commonwealth to present expert testimony in support of the allegation that the documents were forged, the trial court declared a mistrial.

The trial court scheduled a new trial date. Petitioner thereafter filed a motion to bar retrial on grounds of double jeopardy and to dismiss the charges with prejudice, a motion to recuse the trial judge, and a motion for the appointment of the Pennsylvania Attorney General's Office to assume the investigation of the altered documents.

On April 4, 2011, the trial court filed an order with accompanying opinion, denying all of the motions. The trial court denied the double jeopardy motion, finding that the claim was "frivolous as a matter of law, without a shred of support in the record and clearly interposed solely to delay retrial in this matter." The trial court noted that Petitioner had presented fraudulent evidence; the fraudulent evidence was material to the defense case; and the issue arising from the discovery of the fraud was a fact question for the trial court to decide. The trial court also stated that it had considered other options and Petitioner had taken the position that the trial court should either do nothing or declare a mistrial. Separately, the trial court addressed Petitioner's recusal request and concluded that [the trial court] could continue fairly and impartially in the case.

Petitioner appealed the trial court's order to the Superior Court as if it was a final order under 42 Pa.C.S. § 742 and also asked permission to appeal it as an interlocutory order pursuant to 42 Pa. C.S. § 702(b) and Pa.R.A.P 312, 1311, 1501 *et seq.* Petitioner raised both the double jeopardy and the recusal claims. Petitioner did not request a stay of the trial court proceedings from either the trial court or the Superior Court.[1] By *per curiam* order dated April 13, 2011, the Superior Court treated the appeal

---

1. Petitioner did ask the court for a continuance, which the court denied, "provided, however, that if [Petitioner] seeks permission to appeal to the Superior court, this [c]ourt will delay commencement of jury selection until the Superior Court addresses [Petitioner's] request for permission to appeal." (*See* Trial Court Order, dated April 4, 2011).

strictly as a petition for review, rather than as a § 742 appeal as of right and denied relief by the following order:

> And now, upon consideration of the petition for review filed by [Appellant], the interlocutory appeal filed based on double jeopardy grounds is DENIED pursuant to *Commonwealth v. Brady*, 510 Pa. 336, 508 A.2d 286 (1986) which provides that an interlocutory appeal is unwarranted where the double jeopardy claims are deemed frivolous and review may be obtained on direct appeal. Further, the petition for review from the denial of recusal is DENIED.

Superior Court order at 33 WDM 2011, 4/13/2011.

*Commonwealth v. Orie*, —— Pa. ——, ——, 22 A.3d 1021, 1022–23 (2011) (internal citation omitted). Petitioner filed a Petition for Review in the Pennsylvania Supreme Court, which the Court treated as a Petition for Allowance of Appeal ("PAA"). The Court granted Petitioner's PAA in part, vacated this Court's previous order denying interlocutory review, and remanded the case to us with instructions:

> We emphasize that the appellate court's consideration of a petition for review in the *Brady* setting is preliminary in nature. Thus, in a case such as this one, it does not answer the merits of the underlying question of whether the trial court abused its discretion in declaring a mistrial. That question will be answered if the appeal is permitted to go forward under [*Commonwealth v. Bolden*, 472 Pa. 602, 373 A.2d 90 (1977) ]. Again, at the *Brady* petition for review stage, the appellate court's focus is on the finding of frivolousness.
>
> Of course, the appellate court's review of the trial court's finding of frivolousness may require some preliminary assessment of the ruling or event giving rise to

the double jeopardy challenge—here, Petitioner's challenge to the underlying propriety of the trial court's declaration of a mistrial. . . .

> \*   \*   \*

Accordingly, we direct the Superior Court to consider the merits of Petitioner's previously filed Petition for Review as it concerns the trial court's determination of frivolousness. . . .

*Id.* at ——, 22 A.3d at 1027–28. Upon remand, we gave the trial court and the parties a limited period to gather the certified record and supplement their respective positions on the specific matter at issue.

Petitioner presents the following issue for our review:

> WHETHER THE TRIAL COURT ERRED IN LABELING [PETITIONER'S] DOUBLE JEOPARDY CHALLENGE AS "FRIVOLOUS" BECAUSE IT IS HARDLY CLEARLY AND PALPABLY WITHOUT MERIT, THERE WAS NO EVIDENCE LINKING ANY WRONGDOING TO [PETITIONER], THE SIGNATURES IN QUESTION WERE NOT RELEVANT TO THE TRIAL, COULD HAVE BEEN ENTERED FOR A NON–NEFARIOUS PURPOSE, THE AUTHENTICITY OF THE DOCUMENTS WAS BEFORE THE JURY AND FOR THE JURY, THE PROSECUTION HAD AMPLE TIME TO CHALLENGE THEM, THE TRIAL COURT HASTILY DECLARED A MISTRIAL WITHOUT CONSIDERING LESS DRASTIC ALTERNATIVES AND A MISTRIAL WAS GRANTED TO PRECLUDE THE JURY FROM ACQUITTING [PETITIONER]?

(Petitioner's Brief on Remand at 5).

■ As a general rule of Pennsylvania law, a defendant can immediately ap-

peal as of right an order that denies a non-frivolous motion to dismiss on state or federal double jeopardy grounds. *Orie, supra; Commonwealth v. Strong*, 825 A.2d 658, 668 (Pa.Super.2003), *appeal denied*, 577 Pa. 702, 847 A.2d 59 (2004), *cert. denied*, 544 U.S. 927, 125 S.Ct. 1652, 161 L.Ed.2d 489 (2005). *See also Commonwealth v. DeLong*, 879 A.2d 234, 237 (Pa.Super.2005). In this context, a frivolous double jeopardy claim is "a claim clearly and palpably without merit; it is a claim [that] presents no debatable question. Such futile claims, presumably interposed for purposes of delay or disruption, are to be expressly identified by the trial court through a written finding." *Commonwealth v. Gains*, 383 Pa.Super. 208, 556 A.2d 870, 874–75 (1989) (*en banc*.) If the trial court enters a finding that the defendant's double jeopardy claim is frivolous, the defendant may seek preliminary appellate review of that determination *via* a petition filed under the existing procedures set forth in Chapter 15 of the appellate rules. *Orie, supra* at 1027 (adapting and modifying review procedures described in *Brady*.)

In her initial petition of interlocutory review, Petitioner claimed the trial court had hastily granted a mistrial based on allegedly forged documents, improperly substituted itself as fact finder in the jury trial, and *sua sponte* declared a mistrial in haste without considering available, less drastic alternatives. Petitioner maintained there was no manifest necessity to support the mistrial, and the court's decision to declare a mistrial was erroneous and should bar retrial.

■ Following remand, Petitioner elaborates on how she presented colorable double jeopardy claims such that her motion to dismiss was not frivolous. Specifically, Petitioner emphasizes that the court declared a mistrial during jury deliberations,

in an unprecedented act, based on a single, allegedly altered document, when the "fact of forgery" was already before the jury; in so doing, the court substituted itself as fact finder. According to Petitioner, there was no evidence linking her to any wrongdoing. Moreover, Petitioner insists the documents carrying the signatures at issue were not even material to the proceedings. Further, Petitioner asserts the Commonwealth actually waived its claim of doctored evidence by waiting to raise it, suggesting it was untimely. Petitioner insists the court declared the mistrial without allowing the parties to explore available, less drastic alternatives.

Responding to the trial court's opinion, Petitioner states she did not want the trial court to declare a mistrial and pleaded with the court to allow the jury to continue and complete their deliberations. Appellant flatly asserts the Commonwealth and the trial court essentially provoked the mistrial. Petitioner concludes she was constitutionally entitled to have her trial completed by that jury, the court had no manifest necessity to declare the mistrial, Petitioner's double jeopardy motion was not frivolous, and this Court must reverse the determination of frivolousness and allow her to file an appeal as of right on the merits of her double jeopardy claim. Following our review of the record, we cannot agree with Petitioner's contentions.

In response to Petitioner's claims, the trial court stated as follows:

### I. FACTS

On March 3, 2011, after the jury had begun deliberations in this case, the Commonwealth advised the [c]ourt that there was a matter concerning evidence offered by the defense at trial that the Commonwealth wanted to address with the [c]ourt. The parties were summoned to [c]ourt. Contrary to the assertion by the defense that this matter

was brought to the [c]ourt *ex parte* and that the [c]ourt halted jury deliberations without notice to the defense, the [c]ourt took no action until both parties were present in court. Defense counsel was just entering the courtroom when the following took place:

THE COURT: Mr. Claus, you requested this meeting, what is this about?

MR. CLAUS: Your honor, this is a matter that I believe involves fraud upon the [c]ourt. There are documents that I believe are in the possession of the jury, defense documents in this case, 101–B, Defense Exhibit 110, and Defense Exhibit 101–A, and if the [c]ourt might permit me I would put these documents on the screen.

THE COURT: You can wait for Mr. Costopolous before we proceed. Ms. Goldstein, go upstairs and tell the jury that there is a legal matter before the [c]ourt and they are to cease their deliberations until further Order.

(M.T.[2] p. 3). Both counsel were present and, as Mr. Costopolous had just arrived, the [c]ourt directed that the prosecutor wait until [defense counsel] was situated at counsel table before proceeding.

---

[2] M.T. refers to the transcript of the March 3. 2011 proceedings regarding the mistrial.

The Commonwealth then displayed for the [c]ourt three documents, Defense Exhibits 101–A, 101–B, and 110, and contended that two had been altered. The documents were displayed in open court, on an overhead projector. The [c]ourt had personally examined all three documents. It was clear to this [c]ourt that two of the documents [had] been altered and that the signatures of Commonwealth witness Jamie Pavlot that appeared on Exhibits 101–B and 110, were copied from other documents and pasted onto those two Exhibits. 101–A was an apparent original while the other two were photocopies. It was obvious that Jamie Pavlot's signature on exhibit 110 had been copied from Exhibit 101–A and pasted onto Exhibit 110. Ms. Pavlot's signature on Exhibit 101–A, which was a presumed original signature, was directly below the signature of another person. Part of that signature crossed over into the "P" on Pavlot's signature. The signature on Exhibit 110 is reproduced here:

The signatures from 101–A are here:

The sideways "v" that appears in the "P" of "Pavlot" is present in both signatures, clearly establishing that it is the same signature, copied from Exhibit 101–A and pasted onto Exhibit 110.

The signature on Exhibit 101–B was also clearly taken from another document and pasted onto 101–B. This is the signature on 101–B:

The second "s" in "Witness" was covered over when the signature was pasted. Near the end of the signature the signature lines do not match, as the copied signature was not correctly aligned over the signature line on the original document.

The documents in question were in the sole possession of the defense until the defendant identified them during her direct testimony. Although they may have been shown to the Commonwealth when they were used to cross-examine Ms. Pavlot, copies were not provided to the Commonwealth until the defendant authenticated them and they were admitted on February 28, 2011. The defendant specifically refused to provide them when requested earlier when they were shown to Ms. Pavlot. The parties went to side bar during cross-examination to address the proper use of the documents and the following exchange took place:

Mr. CLAUS: After the [c]ourt leaves, I could see if maybe we could get copies and we would be further along, at least having to show them to us, too.

THE COURT: What is that?

MR. CLAUS: Can we see what those are?

MR. COSTOPOLOUS: *No.*

MR. CLAUS: That's all right. That is fine.

Even after [the documents] were shown to Ms. Pavlot, the defense still did not provide copies to the Commonwealth. These three documents were among fifty (50) documents that the defense did not turn over to the Commonwealth until

they were admitted by the defense after the defendant identified and authenticated them. During that testimony on February 28, the following was said at sidebar:

THE COURT: Mr. Claus.

MR. CLAUS: May it please the court, two matters. First of all, I will start with all due respect to counsel here, I have not been able to follow most of the exhibits because we don't have what he is examining this witness on. I have been trying to put it together.

THE COURT: What do you mean, you don't have it?

MR. CLAUS: We just don't have those things. Now some of them we have gone over literally when other witnesses were being questioned we got some of them, but we don't have all of them and we don't have the ones that we—as a matter of fact, there are at least eight of the ones that we have mentioned I don't have for cross-examination. I just don't see them anywhere in my binder, let alone to look at them or use them. So at least, at some point, before I do my cross-examination—

THE COURT: We are going to have to make copies. We will make copies contemporaneously for you. As soon as you introduce them or something, send somebody out to copy them.

It was not until the end of the day on February 28, 2011 that Exhibits 101–A, 101–B, and 110 were provided to the Commonwealth, along with the others that were shown to Ms. Pavlot and then admitted through the testimony of the defendant. They were kept from the Commonwealth until the last possible minute, when they were turned over to the Commonwealth, *en masse*, at the end of the next to last day of trial.

Although this [c]ourt concluded that the documents had been altered, the [c]ourt recessed the trial for two hours to allow the Commonwealth to secure the presence of a document examiner. After the recess, the witness, George Papadopolous, testified that Jamie Pavlot's signature on both Exhibits 101–B and 110 had been cut from other documents and pasted on. He specifically concluded that the signature on Exhibit 110 was lifted from Exhibit 101–A. Defense counsel declined the opportunity to cross-examine the expert.

The [c]ourt, based on both its own examination of the exhibits and the unrebutted testimony of Mr. Papadopolous, concluded that the signatures on Exhibits 101–B and 110 were forgeries; that they had been cut from other documents and placed on the exhibits to make it appear that Jamie Pavlot had signed them. The evidence in support of this conclusion was clear and convincing.

Based upon the record of the trial as a whole, the [c]ourt also concluded that these exhibits had been in the sole possession of the defense from the time of their discovery in January 2010, until they were offered into evidence. The defendant testified that they were turned over to her attorney in January 2010, having been taken from Ms. Pavlot's office. It was also not disputed that the Commonwealth was not provided with access to the documents until the [c]ourt recessed for the day on February 28, 2011. The defendant herself authenticated the forged documents that were admitted into evidence. These facts established, clearly and convincingly, that a fraud upon the [c]ourt had been attempted. The defense offered into evidence documents that had been altered to the benefit of the defense; documents that had been in their sole control. The [c]ourt was required to

take appropriate action to remedy the fraud.

The [c]ourt, several times on March 3, 2011, asked the parties how to address the issue of the forged documents. The defendant avers in her Motion that "... the [c]ourt considered no alternatives before granting a mistrial *sua sponte*— none." This is completely belied by the record. The [c]ourt told the parties, "... I want to hear your suggestions for remedies." Mr. Claus explained that he wanted the jury instructed, "... to compare the signatures on those two suspect documents and at that point they can make whatever determination that they want. They can disregard it, they can accept it as explained as nothing more than an anomaly, or they can choose to take into account that this is evidence of guilty knowledge...." Defense counsel responded to this by telling the [c]ourt, **"Before you do that then declare a mistrial. Before you call this jury in the box and suggest to them that this defense, that my client had anything to do with their theory and their allegations then declare a mistrial. I don't want you fooling with this jury."** (Emphasis added).

Later, after the recess and after the document examiner testified and the [c]ourt determined that the documents had, in fact, been altered, the [c]ourt again requested that the parties provide options to address the problem. The Commonwealth again requested that the jury be instructed on the forged or altered documents; that they be told that if they concluded that the documents had been altered, they could infer guilty knowledge by the defendant. The defense, given another opportunity to pro-

vide the [c]ourt with alternatives to the Commonwealth's suggested remedy, advised that the [c]ourt had only two options: do nothing and allow the jury to resume deliberations with the forged documents still for their consideration or grant a mistrial. Defense counsel said, "Now, we want this jury to render its verdict based solely on the evidence presented. We are asking that their deliberations resume immediately, and we are opposed to a mistrial, **which is the only other option we have got."** [2] (Emphasis supplied). The [c]ourt then declared a mistrial and dismissed the jury.

Allowing a jury to continue deliberations when it is learned that critical documents they were required to consider are forgeries, would be anathema to the "search for the truth" they were mandated to undertake. One could hardly expect twelve citizens to "well and truly try" a case and a "true verdict render according to the evidence" where part of the evidence is a fraud.[4]

---

[4] Pennsylvania jury oath. Pa.R.Crim.P. 640.

## II. MOTION TO DISMISS

In her Motion to Dismiss, the defendant makes several arguments in support of her request that her retrial be barred on double jeopardy grounds. They are each frivolous as a matter of law, without a shred of support in the record and clearly interposed solely to delay retrial in this matter.

This [c]ourt declared a mistrial because the defendant offered forged documents into evidence. The record of the trial and of the proceedings on March 3, 2011 establish that the forged documents

---

**2.** Defense counsel then opposed a mistrial, stating he would assert double jeopardy if the court declared a mistrial. Counsel did not offer any other remedy but to allow the jury to complete deliberations and render a verdict.

were material to the defense in that they were used to impeach the credibility of the Commonwealth's most important witness and that they were in the sole custody and control of the defendant and her counsel since January 2010 when, according to the defendant, they were retrieved from Ms. Pavlot's office. It must be noted that the witness Pavlot, while acknowledging the signatures appeared to be hers, testified she did not recall ever seeing the defendant's exhibits.

This [c]ourt finds it astounding that the defense would argue that the Commonwealth is somehow at fault for not discovering that the documents were forged between the time the Commonwealth gained access to them at the end of the day on February 28 and when they brought the forgeries to this [c]ourt's attention on March 3.

These documents were in the control of the defendant, or her attorneys, for more than a year. Her original attorney took possession of them in January of 2010. Presumably, they were turned over to trial counsel sometime after he was retained. He offered them into evidence after the defendant authenticated them. If any party had the opportunity to discover the "blatant forgery," it was the defense, including the defendant herself. The fact that these documents were so obviously altered and, despite that, offered into evidence by the defense, evinces an inference that the defense knew that they were not genuine. Between the Commonwealth and the defense, it is clear which party should bear the blame for the introduction of evidence that corrupted the search for truth that is at the heart of any trial. Parenthetically, none of this [c]ourt's finding[s] or conclusions should be construed as an accusation that trial counsel

... knew of and/or intentionally introduced fraudulent evidence. This [c]ourt has known defense counsel for more than forty years as a man of the highest personal and professional integrity who would never engage in such activity and the [c]ourt so finds him blameless here.

The submission into evidence of documents that were altered worked a fraud upon this [c]ourt.... Such an attempt clearly occurred here.

This [c]ourt was not dealing with fraud discovered after a judgment had been entered.... Nor was it dealing with a decision it had reached that was later determined to have been secured through the presentation of coerced, perjurious testimony, as occurred in *Commonwealth v. Harper,* 890 A.2d 1078 (Pa.Super.2006) (Superior Court affirmed decision by PCRA court to reverse its year old decision granting defendant a new trial where it was determined that testimony that led to new trial was perjured and witness was coerced into testifying). This [c]ourt was dealing with freshly discovered fraud; fraud that had not yet ripened into the subversion of justice that would have been the result had the jury rendered its verdict in reliance on that forged evidence.

**This [c]ourt did not just have the power to declare a mistrial to prevent the possibility of a verdict tainted by the forged evidence; it had an obligation to do so.** [Emphasis in original].

The authority of a[c]ourt to set aside a judgment or decision obtained by fraud, as established in ... *Harper,* certainly extends to when a court is confronted with fraud that has not yet affected a verdict or decision. Declaring a mistrial avoided the possibility of a verdict tainted by the forged evidence.

The defendant also argues that the [c]ourt erred when it made the factual determination that the documents were forged; that whether the documents had been altered was a factual issue to be decided by the jury. This argument is specious. The jury was not presented with the evidence necessary for it to determine if the documents were forged. Although the defects in the signature on Exhibit 101–B were brought out in cross examination, the clear forgery of the other document, Exhibit 110, was not before the jury as it was not discovered by the Commonwealth until after the jury received the case. To suggest that the jury would have been able to "... determine whether any defense documents had been 'forged' or 'fabricated' and, if so, what the ramifications should be for the overall case and, ultimately, the verdict ..." ignores the fact that the jury was never instructed on what those ramifications could be. They were never instructed that if they concluded that certain documents offered by the defense were forgeries, they could consider that as evidence of guilty knowledge. More importantly, because the defense held these documents "close to the vest," figuratively and literally, not providing the Commonwealth with the opportunity to inspect them until the very end of the trial, the Commonwealth was left without the opportunity to present evidence to the jury that would have aided it in making a determination regarding the documents.

The question of whether the documents were forged was a factual question that this [c]ourt had to decide. If the [c]ourt determined that the evidence did not establish that the documents were altered or that the evidence was inconclusive, no further action would have been required or taken.

Courts are often called upon in criminal matters to make factual determinations in order to make legal rulings. This [c]ourt issued Findings of Fact in connection with its ruling on the defendant's Pretrial Motions. Those findings, which were clearly adverse to the defendant, did not mean that this [c]ourt was prejudiced against the defendant and incapable of fairly presiding over her trial. Similarly, the resolution of the Commonwealth's claim that a fraud had been perpetrated upon the [c]ourt when forged documents were offered and admitted into evidence required that the [c]ourt determine if the documents were, in fact, forged and, if they were, which party was responsible for the fraud. It was proper for the [c]ourt to make these determinations, as they were essential to the [c]ourt deciding whether a mistrial was warranted. That the [c]ourt made these factual determinations does not call into question the [c]ourt's ability to apply the law to these facts in addressing this motion.

The submission to the jury of forged documents under circumstances where the Commonwealth did not have an opportunity to detect the forgery in advance of the document's admission and where the forgery was only discovered after the case was submitted to the jury created the manifest necessity for the mistrial....

\* \* \*

This [c]ourt considered all alternatives. There were three suggested by the parties. The Commonwealth suggested that the [c]ourt:

> Call to the attention of the jury the fact that there were forged documents in front of them and give them the opportunity to either have presented to them by way of stipulation the fact that these documents were forged and

have the opportunity of the jury to make a determination in its own collective mind as to the significance of that which would include either, [number] one, has no consequence; number two, that the two forged documents suggest that there is evidence of guilty knowledge and take into account the fact that the documents themselves reflect an attempt by the defense to perpetrate a fraud upon the [c]ourt.

In reply, the defendant took the position that the [c]ourt should either do nothing or declare a mistrial.[3]

It is interesting to see in the defendant's Motion that she now offers other "alternatives" that were never mentioned by counsel when the [c]ourt asked on two occasions on March 3 what the parties saw as the [c]ourt's options. The claim that the [c]ourt "... failed to consider any available, less drastic alternatives and simply hastily declared a mistrial *sua sponte* ..." (Defendant's Motion at ¶ 61] ), is a blatant misrepresentation of what occurred.

The [c]ourt asked the parties twice on March 3, 2011 what remedies they would suggest. "THE COURT: Mr. Costopolous, your outrage is all well and good, but it doesn't change the facts here. **The question is what the [c]ourt is going to do and I want to hear your suggestion for remedies.**" (Emphasis added). Later, after the recess, the [c]ourt again asked the parties what they saw as the possible options available to the [c]ourt to deal with the forged documents. The Commonwealth again requested the instruction and the defense again asked the [c]ourt to either do nothing or declare a mistrial. The [c]ourt agreed with the defendant that a mistrial was preferable to the Common-

wealth's instruction, and a mistrial was declared. The remedies now offered by the defendant in her Motion are untimely. They should have been proposed on March 3, 2011, when the defendant was given the opportunity, before and after the recess, to give the [c]ourt options that might have avoided a mistrial. Even had they been offered, however, they would not have remedied the harm. Removing the documents from the jury's consideration would have been wholly unfair to the fact-finding process. It would have allowed the defendant to avoid the *consequence of having offered* forged documents into evidence. Moreover, the defendant does not explain what would give the [c]ourt the authority to remove exhibits from the jury's consideration that were admitted into evidence. Nor does the defendant account for the Commonwealth's certain objection to removing from the jury, in a case where the defendant is charged with tampering with evidence, documents offered by the defendant that had been tampered with.

The defendant's suggestion that "special cautionary/limiting instructions to the jury ..." could have been delivered omits any suggestion as to what those instructions might have been. The time for offering such instructions would have been when the [c]ourt asked the defendant for possible remedies short of declaring a mistrial.

The defendant's claim now that there may have been some as yet unidentified instruction that could have allowed the case to proceed to trial is markedly different from the position taken on March 3, 2011 when the defense insisted that this [c]ourt's only options were to allow the jury to continue its deliberations

---

3.  *See* Footnote 2, *supra.*

with no further action taken or to declare a mistrial. Defense counsel categorically rejected any suggestion that the jury be instructed and insisted that the only two options were doing nothing or declaring a mistrial. It is disingenuous to now suggest that there were instructions that could have avoided the necessity for a mistrial.

The sealing of the verdict was not an option, as it would still have resulted in the jury deliberating and returning a verdict on the basis of evidence that was fraudulent. A continuance would not have obviated the fact that forged documents were offered by the defendant. This [c]ourt considered all possible alternatives. None would have remedied the harm done by the submission by the defense of forged documents.

Finally, the defendant contends that the documents were immaterial to the case. The documents were important to the defense to the extent that they were central to their impeachment of Ms. Pavlot. She was the defendant's Chief of Staff throughout the entire time period alleged in the Information. Ms. Pavlot became a cooperating Commonwealth witness and testified at trial that the campaign related activities that she and other employee[s] engaged in were done at the direction of the defendant. The defense theory, as evidenced by the cross-examination of Ms. Pavlot and by defense counsel's closing argument, was that Ms. Pavlot engaged in these activities and had other employees engage in activities, on her own initiative and in direct contravention of directives from the defendant that such activities should not be performed on State paid time. The forged documents, and the others that were introduced by the defendant, were offered to disprove the Commonwealth's main contention: that the de-

fendant directed her employees to engage in illegal political activity.

The documents that this [c]ourt determined to have been altered were first identified during the cross examination of Ms. Pavlot. The defense presented her with fifty separate documents which allegedly contained written directives from the defendant instructing Ms. Pavlot to make sure that campaign activities were not engaged in on State time. Although she recognized the typed portion of both of those documents, she did not recognize [the] hand written notations also included. 101–A and 101–5 were memos to the staff setting forth certain office policies and were to be signed by each staff member and counter signed by Ms. Pavlot. They were material to the defense in that, if they found them to be authentic and the jury believed that Jamie Pavlot received them, they would have completely undermined the testimony of Ms. Pavlot. The defendant cannot argue that they were not material when they offered them into evidence.

The actions of the defense, in offering into evidence documents that had been altered, left this [c]ourt with no choice but to declare a mistrial, and the defendant's claim[s] that manifest necessity did not exist and that a retrial would violate her constitutional right against being placed twice in jeopardy are patently frivolous.

(Trial Court Opinion, dated April 4, 2011, at 2–21) (some internal citations and footnotes omitted). Following remand from the Supreme Court, we gave the parties and the trial court an opportunity to supplement their respective positions. The trial court provided as follows:

There is no dispute over the content of the record before this [c]ourt. This [c]ourt determined, as a factual matter, that the documents offered into evidence

by the defendant as Exhibits 110 and 101 B were forgeries. This [c]ourt also determined, as a factual matter, that the forged documents "... were in the sole possession of the defense until the defendant identified them during her direct testimony. Although they may have been shown to the Commonwealth when they were used to cross-examine Ms. Pavlot, copies were not provided to the Commonwealth until the defendant authenticated them and they were admitted on February 28, 2011." This [c]ourt is not aware of any evidence of record in this matter that calls into question the accuracy of those essential factual findings....

\*       \*       \*

The defendant's [motion was] frivolous because, as this [c]ourt pointed out, the mistrial was caused by the actions of the defendant in submitting documents that had been altered. The [c]ourt requested that the parties suggest appropriate remedies. Twice the defendant suggested remedies and twice those remedies were to either allow the jury to complete its deliberations, using the altered documents without any instruction regarding those documents and without the jury being presented with the evidence of the alterations, or declaring a mistrial. When the Commonwealth suggested that the proper remedy was to bring the jury back from deliberations and provide additional instructions as to the altered documents, defense counsel's response was clear: "Before you do that then declare a mistrial."

The defendant's appeal is frivolous because the defendant, and only the defendant, was responsible for the occurrence that resulted in the mistrial and because the defendant insisted that a mistrial was the only appropriate remedy to the problem of the forged documents; other than doing nothing. What occurred was tantamount to an attempt to perpetrate a fraud upon the [c]ourt and to do nothing would have been to allow that attempt to ripen into an actual fraud. This [c]ourt had to take action to avert that. The [c]ourt took the action that the defendant herself argued was the only alternative to doing nothing: granting a mistrial.

Despite having brought about the mistrial by offering into evidence forged documents, the defendant, nevertheless, sought to bar her retrial on double jeopardy grounds. The appeal from this [c]ourt's denial of that motion is clearly and unequivocally frivolous for, to have barred the defendant's retrial, would have allowed her to benefit from her own conduct that caused the mistrial and from her own insistence that a mistrial was the only appropriate remedy, other than doing nothing. Allowing a criminal defendant to benefit from engaging in conduct during a trial that results in a mistrial would be a gross miscarriage of justice and her attempt to argue that she is entitled to that outcome renders her appeal frivolous.

(Trial Court Opinion, dated July 14, 2011, at 3–4, 5–7) (some internal citations and footnote 1 omitted).[4] We accept the ratio-

4. In footnote one of the court's second opinion, the court stated the Secret Service Reports corroborated the court's prior factual determinations that Defense Exhibits 101–B and 110 had been altered. In Petitioner's supplement to her petition for review, she states the first Secret Service report "foren-sically exonerates" her. The Commonwealth disagreed, as did the court, based on that report as well as the second Secret Service Report. To the extent Petitioner's supplemental petition can be construed as an open petition for review of the first report and her averments based on that report, we deny the

nale set forth in both of the court's opinions.

We have carefully reviewed the certified record in this case to examine the circumstances surrounding the court's declaration of the mistrial. *See Orie, supra.* The defense held the documents for months, until the latest possible moment at trial, before releasing them to the Commonwealth for review, and only after the Commonwealth objected. Further, Petitioner authenticated and submitted the doctored evidence at trial in a manner that was indeed critical to her defense; she submitted the altered documents as exculpatory evidence and cannot in good conscience say the documents were "immaterial." Moreover, when given the opportunity, Petitioner suggested no viable alternatives to a mistrial. Thus, the record supports the court's determination that Petitioner was responsible for the mistrial, and she cannot place liability for the mistrial on either the court or the Commonwealth. As such, we conclude the court properly found Petitioner's motion to dismiss on double jeopardy grounds was frivolous. *See Gains, supra.* Accordingly, we affirm the order expressing that finding.

Order affirmed.

supplemental petition. The court decided the matter based on a record that did not include the Secret Service Reports, and the record speaks for itself.